THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DENNIS CALDERON, Defendant-Appellant.

First District (5th Division) No. 80-1412

Opinion filed October 23, 1981.

Ralph Ruebner and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the offense of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2) and sentenced to nine years in the penitentiary. On appeal, he contends that: (1) his warrantless arrest in his home was unauthorized and made without probable cause, mandating the suppression of the evidence obtained as a result therefrom; (2) the trial court erred in failing to suppress a statement given by defendant prior to receiving *Miranda* admonishments; and (3) the trial court abused its discretion when it employed an arbitrary structure for determining defendant's sentence and when it failed to consider his rehabilitative potential in assessing the penalty.

The pertinent evidence adduced at trial is as follows:

Junior Luciano testified that he owned a jewelry store on 26th Street in the city of Chicago. On February 24, 1979, he closed the store at 9 p.m. Since he had no safe at the store, he put jewelry and the receipts of the day in a briefcase and a plastic shopping bag and placed them in the back seat of his car. Luciano dropped off his wife and children at his home at 1061 North Marshfield at about 10:30 that evening. He then drove southbound on Marshfield to find a parking space. As he was parking his car on the west side of the street, he noticed a green car parked directly opposite of his car on the east side of Marshfield facing north with two persons in it. It was dark, and there was a lot of snow on the ground.

He got out of the car and reached for the briefcase and bag. When he turned around, a man standing a few feet away from him pointed a gun at him and yelled, "Give me the green." Another man was positioned on the side of the green car. The car's engine was running, the headlights were off, and the passenger's door was open. Both wore nylon stockings over their faces.

Luciano told the gunman that everything was in the briefcase. The

man searched him, picked up the bag and the briefcase, and walked backwards to the green car. The gunman then entered the driver's side, the other man got in the passenger's side, and they drove off. Luciano pulled out his gun and fired two or three shots at the car. One of the shots shattered the back window of the car and it crashed into a parked car about three houses north of the crime scene.

The two men exited the car and ran north on Marshfield. Luciano pursued them. The gunman, who was then carrying only the briefcase, fired a shot at Luciano. Luciano ducked into a pile of snow, and returned a shot at the two men as they ran northbound. He followed them as they ran north to Division and east to Milwaukee, but then lost track of them. When Luciano returned to the crashed car, the police were there. The assailants had left the shopping bag containing the jewelry in the car.

At about 4 o'clock the next morning, Luciano went to the police station and identified some jewelry as that which had been placed in the briefcase the previous night. Later, at about 7 o'clock that evening, he viewed a lineup and picked out a man as the one who had accosted him with the gun. He had previously known this person as "Gregory." Gregory had been in his sister-in-law's wedding party and was once a visitor at Luciano's house. Luciano later learned his name to be Gregory Buenfil. Defendant was also present in the lineup, but Luciano did not identify him.

According to Luciano, there had been $700 in cash in his briefcase, but he only recovered $141. The jewelry taken was valued between $15,000 and $25,000.

Paul Gonzalez testified that he had been married to Ida Sonya Gonzalez at one time and they had lived at 1040 W. Hollywood in Chicago. He had owned a 1972 green Camaro during his marriage to her, but the car was awarded to her in their divorce settlement. He did not have possession of the car, nor did he see it for five months previous to the day of the crime.

Investigator Ralph Vucko of the Chicago Police Department testified that he went to the police station at about 11:30 p.m. on February 24, 1979, and spoke to Luciano and some other police officers. He then proceeded to the scene of the incident and examined the crashed car. He found a bullet hole in the roof section of the car near the rear window and several bills and receipts inside the car. They bore the name Paul Gonzalez and the address 1040 W. Hollywood, Apartment 507. A temporary Illinois registration permit taped on the front windshield showed the name Paul Gonzalez, and the address, 932 N. Hamlin. The car keys were still in the ignition.

Vucko returned to the police station and again conversed with

Luciano and the other officers. He then went to 932 N. Hamlin, arriving at about midnight. A person who identified himself as Gonzalez' father told him that his son was not there. He and three other officers then proceeded to the Hollywood address where Vucko opened the vestibule door of the apartment building with one of the keys recovered from the crashed car. When the officers reached apartment 507, they heard voices inside. With revolver drawn, Vucko knocked on the door and announced his office. A woman opened the door. He asked if anyone else was there, but she gave no response. Vucko then saw someone looking through a partially opened door in the apartment. He ordered the person to come out. Defendant, who was dressed in undershorts and a T-shirt, came out from behind the door and immediately assumed a prone position on the floor.

Vucko searched defendant and asked him where his car was. Defendant replied that it was parked in the rear of the building. Vucko and another officer accompanied defendant to the bedroom so that he could get dressed. In the bedroom, Vucko informed defendant of his *Miranda* rights. Defendant indicated he understood these rights. At first, defendant stated that he did not know anything about the robbery on Marshfield. Vucko then showed defendant the keys recovered from the green car, and defendant admitted that they were his. Defendant told Vucko that earlier that day Gregory Buenfil phoned him, and he later picked Buenfil up at his house. They drove around and parked on the 1000 block of Marshfield at about 10 p.m. and drank beer. Another car pulled up, and Buenfil crossed the street and "stuck up the guy" who got out of the car. During the robbery, defendant got out of the car, stood for awhile, got back into the car and pulled off. Some shots were fired, the car crashed and they ran. Defendant admitted to Vucko that he wore a nylon scarf over part of his face that day.

Vucko obtained Gregory Buenfil's telephone number from defendant and traced his address to 4924 N. Drake. $140 was recovered from defendant's wallet, and he was taken into custody.

At about 3:15 that same morning, Vucko and other officers went to the Drake address and arrested Buenfil. They found $141 in Buenfil's wallet and several items of gold jewelry in a paper bag on the rear porch. They also found a suitcase containing jewelry and bills and receipts belonging to Luciano's store under the rear porch of the home.

Defendant testified on his own behalf that he is married to Ida Sonya Calderon, formerly Ida Sonya Gonzalez, and that on February 24, 1979, he was living with her at the Hollywood address. On the day in question, Buenfil telephoned him and asked for a ride to a friend's house. He picked up Buenfil in Sonya's green Camaro. Buenfil told him that he wanted to go to a friend's house to borrow money that he needed for a divorce. At

about 9:45 p.m., defendant pulled the car up in front of Luciano's home. Since the lights were out in Luciano's home, they drove to a tavern a few blocks away to pick up a six-pack of beer.

They then drove back to Marshfield and parked the car, turning off the engine and the headlights. The two men drank beer and conversed for a short while, until a white car arrived and parked directly across from the green car. Buenfil suddenly jumped out of the car and went over to Luciano, who was getting out of the white car. Defendant had never before met Luciano. Buenfil then reached inside his coat, pulled out a gun and put it to Luciano's chest. Buenfil had a nylon stocking over his head. According to defendant, when Buenfil got out of the green car, he had no gun and wore nothing over his head. When Buenfil approached Luciano, defendant did not ask him what he was doing. But when he reached into his coat, defendant "knew what was going to happen." Defendant assumed there was going to be a gun and knew there was going to be a robbery.

Buenfil told Luciano to give him his money or his "green." Defendant got out of the car and was going to run but "just froze." While Buenfil searched Luciano, defendant got in the car to leave. However, the car tires slipped on the snowy pavement, allowing Buenfil to jump in on the passengers' side of the car with Luciano's bag and briefcase.

Shots were fired and defendant lost control of the car, crashing into another car. Both men ran from the crashed car north towards Division. During this time, Buenfil and Luciano exchanged gunfire. Defendant, running ahead of Buenfil, turned the corner at Division, headed over to Milwaukee and eventually made his way down an alley and entered a tavern. Buenfil came in the tavern immediately thereafter. Defendant cursed Buenfil for involving him in the robbery.

About five minutes later, defendant left the tavern. Buenfil followed. Defendant hailed a cab and both got in. Defendant again berated Buenfil for implicating him in the robbery. Buenfil told him to "shut up and keep cool," then directed the cab driver to take him to his home at Drake and Lawrence. When Buenfil exited the cab at that location, defendant told Buenfil that if he were arrested he would "tell them [the police] everything." Buenfil paid the cab driver, took some money out of his coat pocket and threw it at defendant. Defendant picked up the money, put it in his coat pocket and told the cab driver to take him to his home at 1040 W. Hollywood. When he got home, he put the money in his wallet. Defendant was in shock and had a hard time explaining to his wife what had happened. He then went into his bedroom and undressed.

The police arrived about 45 minutes later. They ordered defendant to get on the floor, searched and handcuffed him, and brought him to the

bedroom. Defendant admitted falsely telling Vucko that his car was in the parking lot downstairs. After initially professing no knowledge of any robbery, defendant admitted that he was present during the crime, but did not know "what was going on." According to defendant, he told Vucko that he wore a white wool scarf on the night of the robbery and not one made of nylon.

OPINION

Defendant first contends that the police lacked probable cause to arrest him, and illegally entered his home to effect the arrest. As a result, defendant argues, statements he made to the police and other evidence flowing from the arrest are tainted and should have been suppressed.

Initially, we note that defendant did not file any pretrial motions to quash his arrest and suppress the fruits derived therefrom. In addition, the legality of defendant's arrest and the entry into his home was not challenged in his motion for a new trial. The State argues that since this issue was not raised at the trial court, it must be waived for purposes of review. *People v. Stanley* (1978), 62 Ill. App. 3d 638, 378 N.E.2d 1351; *People v. Davis* (1974), 18 Ill. App. 3d 793, 310 N.E.2d 682.

Defendant argues that the waiver rule should be relaxed in this case for three reasons. The first reason is that the alleged illegal arrest constitutes plain error which affects substantial rights of defendant. In support of this assertion, defendant cites *People v. Willis* (1976), 39 Ill. App. 3d 905, 351 N.E.2d 330, where the court found upon evidence presented at trial that the admission of certain evidence was plain error because it had resulted from an invalid search. In *Willis*, defendant made no motion to suppress and did not object to the introduction of the evidence. In this case, however, we cannot determine from the record whether there was probable cause to arrest defendant, since this issue was never raised at or prior to trial. Investigator Vucko testified at trial that he had a conversation with Luciano and some other police officers before and after he recovered evidence from the disabled vehicle, and that he later conversed with Gonzalez' father. The content of these conversations was not elicited by the State since it was objectionable as hearsay. Yet, information obtained from these people could have been crucial in determining whether Vucko had probable cause to arrest defendant. For instance, Gonzalez' father may have told Vucko that his son's former wife owned a green Camaro and was then living with a man at 1040 W. Hollywood, Apartment 507. Defendant's description might also have been provided, matching one that may have been given to Vucko by Luciano. The facts and circumstances within the knowledge of Vucko, the arresting officer, could have been examined by defendant prior to

trial by a motion to suppress. The content of the abovementioned conversations, even though hearsay, would have been admissible at a suppression hearing. *People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342.

The defendant, however, did not challenge the legality of his arrest and the prosecution was under no burden to adduce testimony at trial establishing probable cause. Hence, it is not possible for us to say what the full evidence might have been had the State been required to justify the arrest. Therefore, we will not speculate as to whether the admission of evidence was plain error on the basis of an incomplete record.

■■ Defendant's second reason advanced for avoiding the waiver rule is that his counsel's failure to raise the issue of the legality of the arrest constitutes ineffective assistance of counsel. The failure of counsel to make a motion to suppress is not *per se* incompetence of counsel, but depends on the circumstances of each case. (*People v. Harter* (1972), 4 Ill. App. 3d 772, 282 N.E.2d 10.) We likewise fail to see how this question can be answered on the basis of the record before us. If the evidence was such that such a motion would be unavailing, the failure to make it would not be incompetence. Therefore, we will not engage in speculation, guess and conjecture to find support for this contention. See *People v. Mitchell* (1979), 78 Ill. App. 3d 851, 397 N.E.2d 569; *People v. Stanley.*

The third reason offered by defendant for addressing the merits of the issue now before us is that the trial court would have applied the wrong standard in evaluating the legality of his arrest had the issue been raised. More specifically, defendant argues that upon a finding of probable cause, the trial court would have determined his arrest to be valid even in the absence of exigent circumstances justifying the entry into his home.

■■ It is clear that exigent circumstances are necessary in order to justify a warrantless, nonconsensual entry into a private residence to effect a felony arrest. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) Contrary to defendant's assertion, however, this rule was recognized in Illinois at the time of his trial and prior to the *Payton* decision. (See, *e.g., People v. Wolgemuth* (1977), 69 Ill. 2d 154, 370 N.E.2d 1067; *People v. Logan* (1979), 78 Ill. App. 3d 646, 397 N.E.2d 504.) Therefore, there is no reason to believe that the trial court would have ignored the· exigent circumstances requirement in assessing the propriety of defendant's arrest. Accordingly, the issues defendant now attempts to raise for the first time concerning his allegedly illegal arrest and the unlawful entry into his home were effectively waived.

Defendant's second contention is that the trial court erred in failing to suppress a statement he made to the police prior to receiving his *Miranda*

warnings. The statement challenged as improperly admitted occurred at the time of defendant's arrest. When Investigator Vucko questioned him in his home as to where his car was, defendant lied by saying that it was in the parking lot. Defendant argues that the admission of the statement was erroneous and prejudicial since it suggested to the jury that he was conscious of his guilt.

In response, the State argues that defendant has waived any objection to the admission of this statement, that the question which provoked defendant's response was of an investigatory nature requiring no admonishments, and that any error in admitting the statement was harmless.

We first examine the waiver argument. Prior to trial, defendant filed a motion to suppress all statements he made to the police. The trial court denied this motion. Defendant made no objections when his statements were admitted into evidence at trial, yet he raised the issue concerning the denial of the motion to suppress in his motion for a new trial.

■■■ It is well settled in this State that the admissibility of an accused's confession or statement may be challenged by either a motion to suppress or an objection at trial, and that failure to pursue one of these devices ordinarily precludes consideration of the matter on appeal. (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Hall* (1976), 40 Ill. App. 3d 56, 351 N.E.2d 639.) In this case, it would have been pointless for defendant to have objected to the admission of the statement in question at trial after the trial court had previously denied his pretrial motion to suppress. By challenging the admissibility of the statement prior to trial and again in his motion for a new trial, defendant adequately brought the issue before the attention of the trial court. We shall therefore consider the merits of this contention.

■■■ The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) "Custodial interrogation" of a defendant means "* * * questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) (Emphasis added.) Although *Miranda* admonishments must be given to an accused during a custodial interrogation, they are not necessary where the police conduct a general, on the scene, questioning as to facts surrounding a crime. (*People v. Tolefree* (1972), 9 Ill. App. 3d 475, 292 N.E.2d 452.) Thus, the question in this case is whether defendant was subject to general, on the scene, questioning by the police when his first statement was made, or whether he was under custodial interrogation and thus deprived of his freedom of action.

■■ We believe that the testimony adduced at the suppression hearing and at trial clearly shows that defendant's statement was given during a period of custodial interrogation which necessitated *Miranda* admonishments. In the early morning hours of February 25, 1979, Investigator Vucko and three other officers entered defendant's home, with revolvers drawn, and ordered the partially clad man out of his bedroom. Defendant assumed a prone position on the floor. During this time, Investigator Vucko had his gun trained on him. Vucko asked defendant where his car was, and was told that it was in the parking lot. Later, while in the bedroom, defendant was informed of his *Miranda* rights and he then gave another statement concerning his involvement in the crime. It is evident from these facts that defendant's first statement was given during a police-dominated atmosphere from which he was unable to leave. Since the appropriate admonishments were not given to defendant before his statement concerning the whereabouts of his car, that particular remark should have been excluded at trial. See *Orozco v. Texas* (1969), 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095.

■■■ There are circumstances, however, where a failure to comply fully with *Miranda* can be classified as harmless error. If it can be determined beyond a reasonable doubt that the error did not contribute to the conviction, a reversal on the constitutional grounds is not warranted. (*People v. Kaprelian* (1972), 6 Ill. App. 3d 1066, 286 N.E.2d 613, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2730; *People v. Landgham* (1970), 122 Ill. App. 2d 9, 257 N.E.2d 484, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389.) In this case, we believe that the statement in question did not prove any element of the crime of armed robbery that was not established more strongly by other competent evidence. The victim's testimony clearly shows that defendant was an active participant in the crime. In addition, proceeds of the robbery were recovered from defendant's wallet when he was arrested, and he gave a statement after proper admonishments admitting his involvement in the crime. Defendant has not challenged in this appeal that he was proved guilty beyond a reasonable doubt. Under these circumstances, the error in the admission of the statement was harmless.

Finally, defendant contends that the trial court erred in employing an arbitrary structure for determining his sentence. He also asserts that his nine-year term for armed robbery erroneously fails to reflect his rehabilitative potential. The first part of defendant's argument is gleaned from a comment made by the trial judge prior to pronouncing sentence. The judge stated that "* * * the sentence of the court will be reduced by, specifically by three years * * * because of your lack of prior criminal record." Defendant interprets this remark to indicate that the trial court improperly used a 12-year starting point in determining the sentence. Since

the range of sentences for armed robbery is six to 30 years (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2(b), 1005—8—1(3)), defendant claims that the proper procedure in sentencing for this crime was to start at the six-year point and then to add or subtract time based upon the aggravating and mitigating factors provided by statute. Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3.2, 1005—5—3.1.

After carefully reviewing the sentencing hearing, we believe that defendant has misinterpreted the trial judge's comment. Although the judge stated that the sentence would be reduced by three years, he noted that defendant's participation in the robbery was "extremely active," and was also aware that shots were fired on a residential street causing a car to crash during the crime. Hence, it is apparent that the trial court may well have started at the six-year point, added six years due to the serious harm threatened by defendant's conduct, and then reduced three years because of the lack of his prior criminal history. In any event, we note that there is no specific formula provided in the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1001—1—1 *et seq.*) for determining a defendant's sentence. It would be illogical in each case to start at the minimum sentence and mechanically add or subtract years depending on each aggravating or mitigating factor. If this were the proper procedure, a defendant convicted of armed robbery but having several mitigating factors and no aggravating factors could hypothetically be sentenced to a term below the minimum. Such a result could not have been contemplated by the legislature.

We likewise reject defendant's assertion that the nine-year sentence is not considerate of his rehabilitative potential. (Ill. Const. 1970, art. I, §11.) The trial court, after considering a presentence investigative report detailing defendant's background, and hearing evidence of his good employment history, his military service and his lack of a criminal record, sentenced him to a term exceeding the minimum by only three years. We do not believe that the trial court abused its discretion in reaching this sentence (see *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), and see no reason to disturb it on appeal.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.