THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TIMMY BRANCH, Defendant-Appellant.

First District (5th Division)   No. 82—2768

Opinion filed April 6, 1984.

Frederick F. Cohn and Robert G. Freeman, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Maureen A. Dahlke, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to a term of 40 years. On appeal, he contends that (1) his

arrest was made without probable cause; (2) the trial court coerced the guilty verdict (a) by making improper remarks, and (b) by giving a prejudicially inaccurate deadlock instruction to the jury; (3) his right to cross-examine a State witness was erroneously restricted; (4) testimony that he was a suspect in an unrelated homicide was improperly admitted; and (5) he did not receive effective assistance of counsel.

At trial, James Boyd, A. L. Myrick and James Myrick related essentially the same version of the events that transpired in this case. Their testimony established that they and several other friends, including Frank Rawls, James Smith and the victim Andre Lofton, were in front of the Myricks' apartment building in Chicago at about 8 p.m. on November 3, 1981, when defendant approached the group. Rawls accused defendant of having robbed him, whereupon a fight ensued between the two men which ended when some shots were fired nearby by an unknown person, causing everyone to run from the scene. About 45 minutes later, the group (except for Rawls) had reassembled in front of the building when A. L. Myrick saw defendant running toward him carrying a shotgun. The streetlights were on, and he was able to see defendant's face clearly as he passed within two feet. James Myrick then hollered, "There's some guy with a gun," and all of the group ran into a nearby building. Boyd and James Myrick heard four or five shotgun blasts, and upon looking back they saw Lofton lying facedown on the stairs of the building. A. L. Myrick also heard several shotgun blasts. When the police arrived, Boyd told them that defendant was the man who had chased them with the shotgun, and the next day Boyd identified defendant from a group of police photographs. On February 13, 1982, Boyd and A. L. Myrick separately viewed a lineup and identified defendant as the gunman.

Officer Collins testified that during the early evening of November 4, 1981, he interviewed Boyd at the police station, and later that night he and his partner went to the crime scene where Boyd identified a picture of defendant as the person carrying the shotgun. He then returned to the police station, where a warrant for defendant's arrest on a charge of murder was issued.

Officer Altman, of the Elmhurst police department, then testified that on February 11, 1982, as he passed a Convenient Food Mart on York Road at about 3:15 a.m., he noticed a white-over-blue 1973 Mercury which he knew did not belong to the owner of the store, parked in a stall facing the building. Ten minutes later, it was still there but had been turned around to face the street, and when he drove into the lot to investigate, he saw three men inside. A check on the license plates disclosed that they belonged to a 1974 Chevrolet which had

been reported stolen in Chicago. He then radioed for a backup unit, and when it arrived the car was stopped and the occupants were asked for identification. Defendant, who was sitting in the right front seat, produced a Colorado driver's license bearing the name "Ray Green," but a computer check thereof indicated no such license on file in that State. The officer also visually compared the license to that of a sample in a book containing pictures of all State driver's licenses, and determined therefrom that it was not a valid Colorado license. He and his partner remained on the street for about 15 minutes, attempting to establish defendant's true identity, and because he was uncooperative, they transported him to the police station where they subsequently learned through a fingerprint check that his real name was Theo Branch and that there was an active warrant for his arrest for a murder in Chicago.

Chicago Detective Sanford testified that he and his partner transported defendant from Elmhurst to a police station in Chicago, where his *Miranda* rights were read to him, and he was told that he had been identified as the gunman in the November 3 murder of Andre Lofton in Chicago. Defendant then admitted that he was there with three other persons; that he had a .38-caliber weapon in his hand; and that, during a shootout which was provoked by a previous robbery and subsequent fight between one of his friends and a man named "Frankie J.," Loften was killed.

Beverly Chapman, the sole defense witness, testified that she was defendant's common law wife and, in mid-October 1981, she and their daughter were living at the Salvation Army Emergency Lodge at 800 West Lawrence Avenue in Chicago. At about 11:30 a.m. on November 3, 1981, defendant, who was unemployed at the time, came there in a cab and took her to a dental appointment after which they shopped, looked at some apartments, and then spent a few hours with defendant's friends at a lounge a few blocks from the scene of the shooting. Defendant took her back to the lodge at about 8 p.m., went inside with her for a few minutes, and then left in the waiting cab. She identified a copy of the log sheet—which residents of the lodge were required to sign each time they left or returned thereto—indicating that on the day in question, she signed out at 11:45 a.m. and returned at 8:05 p.m.

Opinion

We first consider defendant's contention that his arrest lacked probable cause. Specifically, defendant maintains that his arrest was based upon the unfounded suspicions of the arresting officer, arising

solely because he was a passenger in a car bearing improper license plates rather than on a reasonable belief that he was, or had been, engaged in criminal activity. He argues that even if the initial stop of the vehicle was valid, the investigating officers had no reason to presume that he was aware of or in any way responsible for the license plate violation, and thus their questioning should have been confined to the driver of the automobile. His corollary argument is that the information obtained from the officers' demands that he produce identification should have been suppressed as the fruit of this illegal arrest.

Initially, we note that defendant filed no pretrial motions to quash his arrest or suppress evidence obtained therefrom, nor did he raise this issue in his post-trial motion. Failure of the accused to challenge the legality of his arrest in the trial court generally constitutes a waiver thereof for purposes of review. (*People v. Calderon* (1981), 101 Ill. App. 3d 469, 428 N.E.2d 571; *United States ex rel. Johnson v. Illinois* (7th Cir. 1972), 469 F.2d 1297.) Defendant urges, however, that the waiver rule is inapplicable here because the absence of these motions was due to the incompetency of his counsel, which he cites as an additional ground for reversal. The cases have held, however, that it is not incompetence for counsel to refrain from raising issues which, in his considered judgment, are devoid of merit unless his appraisal of the merits is patently incorrect. *People v. Frank* (1971), 48 Ill. 2d 500, 272 N.E.2d 25; *People v. Stanley* (1978), 62 Ill. App. 3d 638, 378 N.E.2d 1351.

In this regard, we note that section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 107—14) provides that a police officer "may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed" a violation of a penal statute, and may demand the person's name and address as well as an explanation of his actions. To be reasonable, the officer's decision to stop must be based upon specific and articulable facts combined with any reasonable inferences therefrom. *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 402 N.E.2d 915.

Here, uncontradicted testimony established that while on a routine patrol, the arresting officer first observed the automobile in which defendant was an occupant parked in the lot of an all-night grocery store at 3 a.m. and became suspicious when, upon passing the store 10 minutes later, he saw the car still there but turned around to face the street. Driving through the lot to get a better view of the vehicle, he observed three men inside, but despite his suspicions of

them, he continued on through the lot and out to the street without further investigation. Immediately thereafter, the car exited the lot and followed him until he turned into a gas station. Upon returning to the street when the car had passed, he saw some objects being thrown from the right window, but it was not until a check of the license plates disclosed that they belonged to an automobile which had been reported stolen that the officer made an investigatory stop of the vehicle. Thus, we are not persuaded by defendant's characterization of this stop as one predicated on mere suspicion or by his corollary argument that *even if* the display of "improper" license plates constitutes a violation of the law,[1] knowledge thereof or responsibility therefor cannot be imputed to a passenger of the automobile.

■ It is our view, however, that defendant and his companions were engaged in conduct which justifiably aroused the suspicions of the investigating officer, and that upon learning that the license plates were stolen, the officer possessed sufficient reasonable grounds to believe that he was confronted with a situation involving a crime, *e.g.*, theft or possession of stolen property (Ill. Rev. Stat. 1981, ch. 38, pars. 16—1(a), (d)) and was thereby justified, under section 107—14, in stopping the vehicle and requiring each of its occupants to identify himself and explain his actions. (See *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92; *People v. Georgev* (1967), 38 Ill. 2d 165, 230 N.E.2d 851.) The identification produced by defendant was determined to be false; but, even so, it was only after an additional 15 minutes of persistently refusing to cooperate with the police that defendant was transported to the police station, where a check of his fingerprints disclosed his identity and that there was an active warrant for his arrest. Therefore, it is our judgment that defendant's presence in a car lawfully stopped for bearing stolen license plates, coupled with his production of false identification and his subsequent refusal to voluntarily give the police the information he was obliged to give, justified their action of transporting him to the police station for further investigation. Under these circumstances, we believe that motions to quash defendant's arrest and suppress evidence therefrom would have been unavailing, and we find no incompetency in his counsel's failure to file them.

■ Defendant next contends that certain remarks by the trial

---

[1]Section 3—703 of the Illinois Vehicle Code (Ill. Rev. Stat. 1981, ch. 95½, par. 3—703) provides that it is a Class C misdemeanor for any person to display upon a vehicle registration plates not issued therefor.

court, followed by the giving of a prejudicially incomplete deadlock instruction, coerced the guilty verdict and deprived him of a fair trial.

It appears that after the jury had deliberated for about 4½ hours, the foreman sent a note to the court which read:

"We have taken several votes on a decision with the final vote of eleven to one guilty. We have collectively discussed the case thoroughly. The one person who has consistently voted not guilty had indicated to us that they could not vote guilty because they do not want anyone to go to jail. Since the beginning they have felt uncomfortable on the jury. What is our next move? Please advise."

Without showing the note to counsel or apprising them of its substance, the trial judge summoned the jury into the courtroom and said:

"Ladies and gentlemen of the jury, I have your note and it seems from the note that you are faced with a dilemma. The person on your jury indicated in this note evidently should not have received jury service."

The court then gave them a deadlock instruction and concluded by saying:

"[N]ow, we will give the jury all the time that it needs. In about an hour we will arrange overnight accommodations and perhaps tomorrow. We won't cut this jury short because of the dilemma it seems to indicate or the impasse that has been caused."

When the jurors retired for further deliberations, defense counsel requested to see the note or to at least be informed of its contents. After first denying the request, the trial judge then read the note aloud, whereupon defense counsel moved for a mistrial on the ground that the trial court's remark regarding the juror who was the subject thereof would serve only to coerce the juror into changing his vote to guilty. In denying the motion, the trial court stated:

"[T]he court's remarks were for the reason that the juror has evidently not concerned himself or herself with the issue that is before it [sic], whether or not the evidence establishes the guilt of the defendant *** and is concerning himself or herself with the punishment that might be imposed if a guilty verdict is returned, which, of course, is beyond what the jury is properly to consider."

Defendant first asserts that the court's comment singling out the one juror who had expressed unwillingness to vote guilty and declaring that the juror should not have received jury service was so prejudicial as to constitute reversible error. We agree.

Although our research discloses that the particular facts of this

case are somewhat unique, issues concerning the propriety of supplemental instructions and other forms of communications between the trial judge and jurors who have been unable to reach a unanimous verdict have been raised in our courts on numerous occasions, and it appears well settled that the trial court has a responsibility to proffer some type of guidance to a jury which has expressed its inability to achieve unanimity in its deliberations and has sought direction from the trial court thereon. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) As with any instruction not found among Illinois Pattern Jury Instructions for Criminal Cases (IPI Criminal), the court's response to the jury must be simple, brief, impartial, and free from argument (87 Ill. 2d R. 451(a)) and may not be an effort by the court, under the guise of guidance, to coerce even a single juror into changing his position merely to secure a verdict (*People v. Anthony* (1975), 30 Ill. App. 3d 464, 334 N.E.2d 208). In reviewing the propriety thereof, the test is whether, upon examination of the totality of circumstances, the language used actually coerced or interfered with the deliberations of the jury to the prejudice of the defendant. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601; *People v. Iverson* (1973), 9 Ill. App. 3d 706, 292 N.E.2d 908.) However, since coercion is a highly subjective concept which does not lend itself to precise definition or testing (*United States v. Brown* (7th Cir. 1969), 411 F.2d 930), the decision of a reviewing court often turns on the difficult task of ascertaining whether the challenged comments imposed such pressure on the minority jurors to cause them to defer to the conclusions of the majority for the purpose of expediting a verdict. *People v. Robertson* (1981), 92 Ill. App. 3d 806, 416 N.E.2d 323.

Applying these guidelines to the case before us, we first note that although the trial court explained to counsel in a discussion held after the jury had retired to deliberate further that its remarks were prompted by the juror's improper consideration of the punishment defendant might receive if convicted and were intended to redirect his attention to the issue of guilt, there is nothing indicating whether the juror was even aware of the impropriety of his digression, and we are unable to discern how the court's statement that he "should not have received jury service" can be said to have adequately apprised him thereof, or how the juror could have extracted therefrom the directive allegedly intended, but not expressed, by the trial court.

Considering the context in which this statement was made, it seems more likely that the court's remarks had the effect of intimidating the juror into changing his vote by implying that his refusal to de-

fer to the majority position somehow should have disqualified him from jury service. We are also of the opinion that the court's concluding remarks concerning the "impasse that has been caused" and the possibility of overnight sequestration only reinforced that pressure by insinuating that the juror had already created a problem, and that if he failed to alter his position within one hour he would be responsible for further inconvenience to himself and his fellow jurors. We are not unmindful of the peculiar situation with which the trial judge was faced, and we do not question the integrity of his motives, but "[a] verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees" (*People v. Golub* (1929), 333 Ill. 554, 561, 165 N.E. 196, 199), and although the length of subsequent deliberations, standing alone, is not conclusive in determining whether the court's remarks were the primary factor in the procurement thereof (see *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), notably brief deliberations do invite such an inference (see *People v. Richards* (1968), 95 Ill. App. 2d 430, 237 N.E.2d 848; compare *People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359; *People v. Green* (1980), 91 Ill. App. 3d 1085, 415 N.E.2d 595; *People v. Allen* (1977), 47 Ill. App. 3d 900, 365 N.E.2d 460). Here, the fact that the jury deliberated for 4½ hours before hearing the challenged remarks, but for only 10 minutes thereafter, belies the State's assertion that they did not impose any pressure on the minority juror to heed the majority and thus to change his vote for the sole purpose of rendering a verdict.

Defendant also asserts that the instruction given following these offensive prefatory remarks was an inappropriate and prejudicially incomplete version of the deadlock instruction prescribed in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. In *Prim*, our supreme court rejected the much-criticized "Allen charge" approved by the United States Supreme Court in *United States v. Allen* (1896), 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154, because it contained language which had the effect of urging dissenting minority jurors to "heed the majority." Although the *Prim* court did not find the instruction before it, which was a variation of the traditional "Allen charge," to have coerced the guilty verdict returned, it did take the occasion to formulate a model instruction designed to avoid coercion of future deadlocked juries specifically incorporating therein the five points recommended by the American Bar Association Minimum Standards Relating to Jury Trials. The court stated, "We are of the belief that the adoption of [these]

standards *** will resolve the many questions created by the uncertainty attendant upon instructing a jury that is in disagreement," and then held, "we direct that hereafter the trial courts of this State when faced with deadlocked juries comply [therewith]." *People v. Prim* (1972), 53 Ill. 2d 62, 76.

In the instant case, the trial court recited verbatim the first portion of the *Prim* instruction, which provides:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous."
> (*People v. Prim* (1972), 53 Ill. 2d 62, 75-76.)

However, the court failed to include the remainder of the instruction, which reads as follows:

> "But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." *People v. Prim* (1972), 53 Ill. 2d 62, 76.

Defendant argues that the deleted language was necessary to balance the "heed the majority" theme of the preceding sentences, and that its omission intensified the coercion created by the court's aforementioned prefatory remarks. In response, the State asserts that a verbatim recitation of the entire *Prim* instruction is not required as long as the language used comports with the guidelines thereof, and that the inclusion here of the words *"deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself"* (emphasis added) (*People v. Prim* (1972), 53 Ill. 2d 62, 75-76) adequately urged the juror not to heed the majority but, rather, to make an independent decision. The State analogizes the instant instruction to that given in *People v. Green* (1980), 91 Ill. App. 3d 1085, 415 N.E.2d 595, wherein the court found that the omission of the italicized language above was not reversible error. We note, however, that in so ruling, the *Green* court found that the inclusion of the language omitted in our case specifically cau-

tioned the jurors against heeding the majority and noted that the additional 4½ hours for which the jurors deliberated after being instructed indicated that they felt no coercion from the court's action.

Here, not only did the court exclude the more specific balancing language used in *Green,* but also concluded its charge with the words "[b]ut do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous." In the light of the brevity of the subsequent deliberations and considering the pressure already imposed by the court's preliminary comments, we believe that the remaining three sentences of the *Prim* instruction should have been given.

Moreover, where the decision to give a deadlock instruction is within the discretion of the trial court (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112), it is questionable here whether, in the light of the juror's preoccupation with the issue of punishment, rather than with the evidence as it related to guilt or innocence, this situation was in fact a true deadlock, warranting an instruction thereon, or whether some other instruction—such as IPI Criminal No. 1.01(4)—which specifies: "You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation ***" might have been more appropriate. The State argues that this instruction would have been improper because the Committee Note thereafter indicates that it should not be used unless the issue of punishment is raised in closing arguments. However, as noted in *People v. Parker* (1983), 113 Ill. App. 3d 321, 447 N.E.2d 457, the purpose of that caveat is to avoid injecting extraneous matters which the jurors might not have considered had they not been brought to their attention. Here, the issue of punishment had obviously been raised by the jurors, and it is our view that IPI Criminal No. 1.01(4), or an appropriate variation thereof, was warranted.

In view of our holdings as set forth above, we need not address the remaining issues raised by defendant. We point out, however, that defendant does not contend that the evidence does not support his conviction and, from our review of the record, we find that his guilt was proved beyond a reasonable doubt.

Accordingly, and for the reasons stated, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

MEJDA, P.J., and WILSON, J., concur.