FOURTH DIVISION
 DECEMBER 26, 1996
 












No. 1--93--1028

THE PEOPLE OF THE STATE OF ILLINOIS,

 Plaintiff-Appellee,

 v.

JAMES FIELDS,

 Defendant-Appellant.)
)
)
)
)
)
)
)
) 
Appeal from the
Circuit Court of
Cook County

No. 91--CR--20467

Honorable
James Schreier,
Judge Presiding.


 JUSTICE CERDA delivered the opinion of the court:
 Following a jury trial, defendant, James Fields, was
convicted of two counts of first-degree murder (720 ILCS 5/9-
1(a)(1)(West 1992)) and sentenced to two terms of natural life
imprisonment without parole. On appeal, defendant asserts that
(1) he was denied a fair trial by the State's improper use of
out-of-court statements; (2) the trial court impermissibly
hastened the verdict by telling the jury that their
transportation was waiting; and (3) he was not proven guilty
beyond a reasonable doubt. For the following reasons, we affirm.
 On June 8, 1991, Willie Range, James Campbell, and Andrew
Rudolph lived with Barbara Wiley, who was Range's sister, at 439
E. 111th Place in Chicago. When Wiley left the apartment at 10
p.m., Range, Campbell, and Charlie Stewart, a friend, were there.
When she returned home at 2 a.m., she learned that Range and
Campbell had been fatally shot. At 2:25 a.m., Chicago police
officer William Peak discovered the bodies on the apartment's
dining room floor. They were still bleeding.
 Dr. Mitra Kalelkar, the assistant Cook County Medical
Examiner who performed the autopsies, testified that each of the
victims was killed by a single gunshot wound to the head, fired
from close range, but the bullets she retrieved from the victims
were unsuitable for calibration. 
 Andrew Rudolph testified that he was asleep in the apartment
at 1:30 a.m. on June 9, 1991, when he was awakened by two
gunshots. He looked around the apartment and saw two dead
people, whom he "did not really" recognize. No one else was in
the apartment, so he got up and left.
 Rudolph stated that he gave an oral statement at the police
station. In that statement, he told the police that he was
sleeping on the couch when he was awakened by two gunshots. He
looked up and saw defendant standing in the dining room. 
Defendant looked directly in his face, then walked out of the
apartment and down the street. Range and Campbell had been shot
and were lying on the dining room floor. Rudolph denied telling
the police that defendant's arm was pointing downward toward
Range. 
 Rudolph further testified that he signed a written statement
prepared by assistant State's Attorney Daniel Lynch. He admitted
that he told Lynch that he was sleeping on the living room couch
at 1:15 a.m. on June 9, 1991, but denied saying that Janice White
woke him, asking him to sell her rock cocaine. He also denied
telling Lynch that he lay back down after the conversation, but
could not fall asleep because alot of people were talking in the
apartment and the television, lights, and fan were on. 
 Rudolph admitted that he told Lynch he was awakened by the
first gunshot and he heard a second gunshot three seconds later. 
Defendant, who was standing in the dining room, turned toward
Rudolph, looked at him, began to walk toward him, then turned and
left the apartment. Rudolph got up, saw that Range and Campbell
had been shot, and smelled the gunpowder. He did not see any
weapons near the bodies or in the hands of the victims. After
leaving the apartment, he saw defendant get into a car and drive
away. Rudolph denied telling Lynch that no one else was in the
apartment at the time of the shooting or that defendant drove
away within a minute of the shooting. 
 In addition, Rudolph stated that he told the grand jury on
June 10, 1991, that Range, Campbell, and Stewart were in the
apartment when he returned at 12:15 a.m. on June 9, 1991. His
grand jury testimony was substantially the same as his written
statement to Lynch. At trial, Rudolph made the same admissions
and denials about his grand jury testimony as he had about his
written statement. 
 According to Rudolph, he was intoxicated and high on
marijuana at the time of the shootings and when he made his
statements at the police station. He claimed that he gave his
out-of-court statements, which were composed by the police,
because the police threatened several times to charge him as an
accessory to murder. Rudolph also stated that he read only part
of the written statement before signing it. 
 Detective Jack Hines testified that he spoke with Rudolph at
7 a.m. on June 9, 1991, in the police station. Rudolph said that
he saw defendant in the apartment and that defendant's arm was
pointing downward toward Range, who had been shot and was lying 
under the table. Defendant looked at Rudolph, then walked out of
the apartment. After Rudolph saw both victims shot on the dining
room floor, he went outside where he saw defendant get into a car
and drive away. According to Hines, there was no indication that
Rudolph was intoxicated or high on drugs when he gave his
statement. Hines denied threatening Rudolph with charges or
mistreating him in any way. 
 After assistant State's Attorney Lynch testified that he
took a written statement from Rudolph on June 9, 1991, over
objection, he read the entire statement to the jury. Assistant
State's Attorney Nancy Black, over objection, read Rudolph's
entire grand jury testimony to the jury after she testified that
Rudolph did not complain about any mistreatment by the police
prior to the grand jury hearing.
 Alesha Parks, who has a child with defendant, testified that
she had been dating defendant for a year prior to the early
morning hours of June 9, 1991, when she and defendant walked to
439 E. 111th Place. After Janice White, Range, and another woman
let them into the building, White and defendant had a
conversation, but Parks could not hear what was being said. When
White, Range, and the other woman went upstairs to a second-floor
apartment, Parks and defendant remained on the first floor. 
Parks denied that she saw defendant take a gun out of his
waistband and put it on a ledge or unscrew the light bulbs. A
short time later, White reappeared. Parks testified that White
did not come downstairs to talk with defendant, but instead,
stayed on the second floor and summoned him. When defendant went
upstairs, Parks left to get a jacket and did not return to the
building. 
 Parks gave a written statement to assistant State's Attorney
Lynch, in which she stated that defendant came to her house at
12:40 a.m. on June 9, 1991, and asked her to go to a motel to
have sex. She did not remember saying that she told defendant
her mother would not allow her to leave the front of the house,
but she did tell Lynch that they took a walk to 439 E. 111th
Place. Once they were inside the vestibule, Parks saw defendant
take a gun out of his waistband and put it on the steps. A short
time later, White, Range, and another woman came into the
building and went upstairs while Parks and defendant continued to
talk on the first floor. Later, White came downstairs and told
them that they could get comfortable in the room upstairs, but it
would cost a rock of crack cocaine. 
 Defendant and White went into the second-floor apartment
while Parks waited in the hallway. She heard White and defendant
arguing with Range, who wanted an extra rock of crack for
himself. Defendant came out to the hallway and said that "they
were trying to play him" and "he should go and kill all four of
them." After White came out and told defendant that she would
get some crack from Rudolph, defendant went into the kitchen with
White, Range, and Campbell while Parks sat on the living room
couch. 
 Campbell reappeared from the kitchen with a plate of noodles
and sat down at the dining room table, but Range and defendant
continued to argue in the kitchen. After White and the other
woman left, Range told Parks to leave. Parks denied that
defendant walked her downstairs before he returned to the
apartment to use the washroom. She testified that she told Lynch
that defendant, Range, Campbell, and Rudolph were the only people
in the apartment when she left. Two minutes later, as Parks was
walking on the street, she heard two loud gunshots and then saw
defendant come out of the building. He had a gun, which he put
in his waistband. He walked over to two men, Snake and Jimmy,
and said, "I shot him. Come on. He's dead," then got into a car
and drove away. 
 According to Parks, her prior statements at the police
station and to the grand jury were coerced. When she returned
home from the police station, she told her parents that she had
given a false statement. They told her to tell the truth to the
grand jury, but when Parks met with assistant State's Attorney
Black prior to the grand jury hearing, she reluctantly agreed to
testify in conformance with her statements at the police station.
 Parks told the grand jury that she had been dating defendant
on and off for three years when he came to her house in the early
morning hours of June 9, 1991, and asked her to take a ride. She
told him that her mother would not allow her to leave the block,
so they walked to 439 E. 111th Place. When they entered the
vestibule, defendant unscrewed the light bulbs, then pulled a
revolver out of his waistband and put it on the ledge. Shortly
afterwards, White, Range, and a woman named Annette came into the
building. White hugged defendant, then sat on the ledge to talk. 
Defendant tried to shield the gun with his arm. 
 When White, Range, and Annette went upstairs, White asked
defendant if he wanted privacy. He told her "no" and stayed with
Parks on the first floor. Two minutes later, he went to the
second floor and knocked on the apartment door. White told him
that it would cost him some cocaine or $10 for a room. When he
told her he had neither, White and defendant went to talk to
Range while Parks stood near the bathroom door. Parks could hear
Range and defendant arguing. 
 Shortly afterwards, defendant and Parks went into the
hallway, where defendant said that the people inside were begging
for cocaine and that "he should go in there and shoot all four of
them, and maybe they have a better life." White reappeared and
told defendant that Rudolph, who was sleeping on the couch, had
some cocaine. Defendant went back into the kitchen while Parks
sat on the couch. She could hear him arguing with Range and
Campbell, then saw Campbell come into the dining room with a bowl
and start eating. 
 After White and Annette left, Range told Parks to leave. As
she was leaving, she overheard defendant remind Range that he
used to sell drugs to Range's brother. She did not see anyone
with a gun in the apartment, but shortly after she left the
building, she heard two gunshots, then saw defendant coming down
the street. He put a gun in his waistband, then told Jimmy and
Snake that he "just shot him, they're dead." Defendant got into
a car and left. 
 Assistant State's Attorney Lynch read Parks's written
statement to the jury in its entirety, and assistant State's
Attorney Black testified about the circumstances surrounding
Parks's grand jury testimony, but did not read it to the jury.
 Defendant presented the testimony of Parks's parents, who
testified about the police taking their daughter and questioning
her at the police station. Mrs. Parks stated that her daughter
told her she was forced to make a false statement to the police.
 After the close of testimony, at 6:45 p.m., the defense
counsel objected to closing arguments being heard before the next
morning. The trial court asked the jury whether they wanted to
continue that evening. Because they answered affirmatively, the
closing arguments were heard and the jury began its deliberations
at 8:26 p.m. over the defense's objection. At 10:45 or 10:46
p.m., the trial court informed the parties he had earlier told
the deputy sheriff to tell the jury at 10:45 p.m. that
transportation was waiting to take them to their hotel
accommodations. When the sheriff did so, the jury asked if they
could have another 10, 15, or 20 minutes. While the defense
attorney was making his objections, at 10:50 p.m., the jury rang
the buzzer to indicate that it had reached a verdict. The jury
was brought into the courtroom, but the sheriff informed the
court that one of the jurors was upset in the restroom. The jury
was taken back to the jury room and returned 30 seconds later
with all the jurors present. 
 Defendant was convicted of the first-degree murders of Range
and Campbell. Subsequently, the trial court found that defendant
was eligible for the death penalty, but that sufficient
mitigating factors precluded him from being sentenced to death. 
Instead, he was sentenced to two terms of natural life
imprisonment without parole.
 The first issue is whether the State improperly used the
prior inconsistent statements by Andrew Rudolph and Alesha Parks,
which were admitted as substantive evidence under section
115-10.1 of the Criminal Code of Procedure of 1963:
 "In all criminal cases, evidence of a statement
 made by a witness is not made inadmissible by the
 hearsay rule if
 (a) the statement is inconsistent with his testimony at
 the hearing or trial, and
 (b) the witness is subject to cross-examination
 concerning the statement, and
 (c) the statement--
 (1) was made under oath at a trial, hearing, or
 other proceeding, or
 (2) narrates, describes, or explains an event or
 condition of which the witness had personal knowledge,
 and (A) the statement is proved to have been written or
 signed by the witness, or (B) the witness acknowledged
 under oath the making of the statement either in his
 testimony at the hearing or trial in which the
 admission into evidence of the prior statement is being
 sought, or at a trial, hearing, or other proceeding, or
 (C) the statement is proved to have been accurately
 recorded by a tape recorder, videotape recording, or
 any other similar electronic means of sound recording." 
 725 ILCS 5/115-10.1 (West 1992).
 Although defendant agrees that the out-of-court statements
by Rudolph and Parks met the requirements of section 115-10.1 to
the extent that they were inconsistent with the trial testimony,
he asserts that he was denied a fair trial because the State
unnecessarily repeated several times the substance of the entire
statements to the jury in an attempt to prove that they were
true. He further argues that the cumulative and repetitive
testimony elicited by the State improperly bolstered the
credibility of the out-of-court statements and only the
inconsistent portions of his prior statements should have been
admitted at trial.
 A court does not have to make a "quantitative or
mathematical analysis" of whether a witness's entire statement is
inconsistent for the entire statement to be admissible. People
v. Salazar, 126 Ill. 2d 424, 456-58, 535 N.E.2d 766 (1988);
People v. Morales, 281 Ill. App. 3d 695, 701, 666 N.E.2d 839
(1996). Instead, the trial court has the discretion to determine
whether or not the testimony is admissible. Salazar, 126 Ill. 2d
at 457; Morales, 281 Ill. App. 3d at 701.
 We find that the out-of-court statements by Rudolph and
Parks were sufficiently inconsistent that the trial court did not
abuse its discretion in allowing the entire statements to be
admitted into evidence. Further, we do not think that the
repetitive testimony prejudiced defendant. However, the
testimony was unnecessarily repetitive, and we caution the State
to refrain from needless repetition of a witness's prior
inconsistent statements. 
 Defendant's next assertion is that Parks's prior statements
contained inadmissible details that were designed solely to
portray him unfavorably before the jury. Specifically, defendant
complains that the testimony about his prior drug sales was
highly prejudicial other crimes evidence and that the testimony
about his sex life with Parks, who was 17 years old, was intended
solely to portray him as an immoral person. 
 Although the evidence of defendant's prior drug sales was
irrelevant other crimes evidence (People v. Gilliam, 172 Ill. 2d
484, 514 (1996); People v. Williams, 165 Ill. 2d 51, 61, 649
N.E.2d 397 (1995)), we find the error to have been harmless. 
Reversal is not required where the record affirmatively shows
that the error was not prejudicial. People v. Richardson, 123
Ill. 2d 322, 342, 528 N.E.2d 612 (1988). 
 As to the evidence of defendant's negotiations with White,
Range, and Campbell for the use of a room, that evidence was
proper evidence of defendant's motive for the shooting. People
v. Jones, 156 Ill. 2d 225, 239, 620 N.E.2d 325 (1993). 
 Next, defendant argues that Parks's written statement
regarding his confession to Snake and Jimmy was inadmissible
under section 115-10.1(c)(2) because it was beyond her personal
knowledge. Parks stated that after defendant came out of the
building, he told Snake and Jimmy that he had shot the victims. 

y Although Parks's grand jury testimony about defendant's
confession was admissible under section 115-10.1(c)(1), her
written statement would be admissible under section (c)(2)(A)
only if it was within her personal knowledge. Morales, 281 Ill.
App. 3d at 700; People v. Hastings, 161 Ill. App. 3d 714, 719,
515 N.E.2d 260 (1987). The personal knowledge requirement limits
the use of out-of-court statements to those events the witness
actually observed. Morales, 281 Ill. App. 3d at 700; People v.
Cooper, 188 Ill. App. 3d 971, 973, 544 N.E.2d 1273 (1989). 
Because Parks had no personal knowledge that defendant had shot
Range and Campbell, it was improper to admit her written
statement regarding defendant's confession into evidence. 
However, the admission of her statement was harmless error. In
contrast, the admission of her statement, that after she heard
two gunshots, she saw defendant come out of the building with a
gun and put it in his waistband, was proper.
 Defendant further asserts that he was prejudiced by the
trial court's statement to the jury during deliberations that 
transportation was waiting to take it to the hotel. We disagree. 
 In determining the propriety of the trial court's comments
to the jury, the test is whether, upon examination of the
totality of circumstances, the language used actually interfered
with the jury's deliberations and coerced a guilty verdict. 
People v. Defyn, 222 Ill. App. 3d 504, 515-16, 584 N.E.2d 220
(1991); People v. Ferro, 195 Ill. App. 3d 282, 292, 551 N.E.2d
1378 (1990); People v. Branch, 123 Ill. App. 3d 245, 251, 462
N.E.2d 868 (1984). Since coercion is a highly subjective concept
that does not lend itself to precise definition or testing, the
reviewing court's decision often turns on the difficult task of
ascertaining whether the challenged comments imposed such
pressure on the minority jurors that it caused them to defer to
the conclusions of the majority for the purpose of expediting a
verdict. Branch, 123 Ill. App. 3d at 251. Although the length
of deliberations following a trial court's comments is relevant
to the issue of coercion, informing a jury that it will be
sequestered after a certain time is not necessarily coercive. 
Ferro, 195 Ill. App. 3d at 292; Branch, 123 Ill. App. 3d at 252.
 There is no evidence that the jury was pressured in any way
when it was informed that transportation was waiting. This case
differs from those cases where the trial court gave the jury a
deadline (see Ferro, 195 Ill. App. 3d 282, People v. Friedman,
144 Ill. App. 3d 895, 494 N.E.2d 760 (1986), and Branch, 123 Ill.
App. 3d 245) and is similar to those cases where the jury
requested more time to deliberate (see People v. Steidl, 142 Ill.
2d 204, 568 N.E.2d 837 (1991), People v. Nemecek, 277 Ill. App.
3d 243, 660 N.E.2d 133 (1995), and Defyn, 222 Ill. App. 3d 504).
 In the case of People v. Friedman, 144 Ill. App. 3d 895, 494
N.E.2d 760 (1986), the jury retired to deliberate in the late
afternoon. At 7:00 p.m., the jury requested a transcript of the
trial. When the court informed the jury that no transcript was
available, the jury returned to the jury room. At 9:00 p.m., the
jury inquired about the meaning of "unauthorized control over
merchandise." The court orally answered the question and then
stated:
 "As long as you're out here I will tell you
 that in about half an hour we have to arrange
 overnight accommodations for you, which we do
 very often, and then you would be back here
 tomorrow morning. So in the meantime, that
 will be in about 45 minutes probably. So you
 may return to the jury room." Freidman, 144
 Ill. App. 3d at 903.
 The jury returned guilty verdicts five minutes later. The court
in Friedman held that the court's comment impermissibly hastened
the verdict.
 In the case sub judice, the jury had no questions regarding
the evidence or the jury instructions, as in Friedman, nor did
the court give them a deadline to decide whether overnight
accommodations would or would not be necessary. The court in
this case did not grant the jury additional time to deliberate.
The request for additional time came from the jury. In this
case, at 6:45 p.m., the jury chose not to wait until the next
morning to hear the closing arguments and begin deliberations. 
At 10:45 p.m., when the jury was informed that transportation was
waiting, the jury requested that it be given another 10, 15, or
20 minutes to deliberate. We do not believe that the holding in
Friedman is applicable to this case.
 We conclude that the trial court's actions were not coercive
and did not interfere with the jury's deliberations. At 10:45
p.m., the deputy sheriff, under the trial court's direction,
informed the jury that transportation was waiting to take it to
the hotel. The jury was not given a deadline. Instead, it asked
for another 10, 15, or 20 minutes, and returned a guilty verdict
five minutes later, before it got an answer from the trial court. 
Although one juror was upset in the bathroom and did not
initially return to the courtroom with the jury, there was no
evidence that this was caused by any feeling of being coerced. 
After the jury was taken back to the jury room, it returned 30
seconds later with all the jurors present. The totality of
circumstances indicates that the trial court's actions did not
interfere with the jury's deliberations or coerce a guilty
verdict. 
 Defendant's final assertion is that he was not proven guilty
beyond a reasonable doubt because the only evidence linking him
to the murders was the prior inconsistent statements of Rudolph
and Parks, which contradicted each other in critical ways, were
severely impeached by their trial testimony, and did not
significantly implicate him in the shootings. We disagree.
 The inconsistencies in this case were not so improbable or
unsatisfactory that they created a reasonable doubt as to
defendant's guilt. Gilliam, 172 Ill. 2d at 515; Steidl, 142 Ill.
2d at 226. Instead, they affected the witnesses' credibility,
which is best left to the jury to evaluate. Determination of the
weight to be given to the witnesses' testimony, their
credibility, and the reasonable inferences to be drawn from the
evidence are the responsibility of the fact finder. People v.
Enis, 163 Ill.2d 367, 393, 645 N.E.2d 856 (1994); Steidl, 142
Ill. 2d at 226. Considering all the evidence in this case in the
light most favorable to the prosecution, a rational juror could
have found the essential elements of first-degree murder beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L.
Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); Gilliam, 172 Ill.
2d at 515; People v. Rivera, 166 Ill. 2d 279, 287, 652 N.E.2d 307
(1995). Therefore, we conclude that there was sufficient
evidence to find defendant guilty of both murders beyond a
reasonable doubt.
 Based on the foregoing, we affirm the circuit court's
judgment.
 Affirmed.
 Tully, P.J., and Gallagher, J., concur.