# Illinois Official Reports

## Appellate Court

*Freeman v. City of Chicago*, 2017 IL App (1st) 153644

| | |
|---|---|
| Appellate Court Caption | SHERI DENISE FREEMAN, as Independent Administrator for the Estate of TOMMYE RUTH FREEMAN, Deceased, Plaintiff-Appellee, v. THE CITY OF CHICAGO, a Municipal Corporation, Defendant-Appellant. |
| District & No. | First District, First Division Docket No. 1-15-3644 |
| Filed | March 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-1068; the Hon. Edward S. Harmening, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellant. <br><br> Larry A. Power, Jr., of Power Rogers & Smith, LLP, of Chicago, for appellee. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion. Justice Harris concurred in the judgment and opinion. Presiding Justice Connors concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1    Defendant City of Chicago (City) appeals from the entry of a jury verdict in favor of plaintiff Sheri Denise Freeman, the administrator of her mother Tommye Ruth Freeman's estate. On July 3, 2008, Tommye Freeman was struck by a vehicle driven by Rodney Jones after Chicago police officers John Kennedy and Dan Passarelli had attempted to pull over Mr. Jones. Mr. Jones sped away from the officers and drove through a red light at the intersection of 76th and State Streets, striking Tommye Freeman, who subsequently died from her injuries. On appeal, the City contends that (1) the circuit court erred in not granting its motion for judgment notwithstanding the verdict because the evidence at trial demonstrated that Officer Kennedy's actions were not the proximate cause of Tommye Freeman's injuries and (2) it is entitled to a new trial because the jury's verdict was the product of coercion. For the following reasons, we affirm.

¶ 2                                      BACKGROUND

¶ 3    Sheri Freeman filed a lawsuit in January 2009 on behalf of the estate of her mother, Tommye Freeman, alleging a claim against the City based on the willful and wanton conduct of its police officers, pursuant to both the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2008)) and the Survival Act (755 ILCS 5/27-6 (West 2008)).

¶ 4    The jury trial began on June 18, 2015. The evidence presented at trial demonstrated that on July 3, 2008, Officer John Kennedy and Officer Dan Passarelli of the Chicago police department (CPD) attempted to pull over the occupants of a white SUV when the driver of the SUV, Rodney Jones, accelerated away westbound down 78th Street, which is a one-way eastbound street. Officer Kennedy, who was driving the squad car, drove behind the SUV, also going the wrong way down 78th Street before turning onto State Street with the flow of traffic. When the SUV reached 76th and State Streets, it collided with Tommye Freeman's vehicle, resulting in the injuries that lead to Tommye Freeman's death.

¶ 5                        A. Testimony of Officer John Kennedy

¶ 6    Counsel for Sheri Freeman first called Officer Kennedy as an adverse witness. Officer Kennedy agreed to the following facts. At approximately 6:30 p.m. on July 3, 2008, he and his partner, Officer Passarelli, were near 78th Street and Langley Avenue when they were waved down by a man. Officer Kennedy stopped his squad on the side of 78th Street, a one-way eastbound street, to speak with the man, who told the officers that his home had been burglarized. At that time, a white SUV slowly came out of a nearby alleyway, turned right, and proceeded westbound on 78th Street. The man who had waved them down told the officers that the occupants of the SUV had burglarized his home. Officer Kennedy attempted to pull over the SUV by activating his lights and siren and making a U-turn but, as he was attempting to maneuver behind the SUV, the driver of the SUV accelerated away from the officers, continuing westbound on 78th Street. Officer Kennedy followed the SUV on 78th Street, also going the wrong way down this one-way street, still with his oscillating lights activated and intermittently using his siren.

¶ 7    Between Langley Avenue and State Street, 78th Street runs through a residential neighborhood. That stretch of 78th Street is a little less than one mile long and has stop signs

for eastbound traffic at 11 or 12 intersections. The SUV did not stop at the intersections as it continued west on 78th Street. Officer Kennedy "slow[ed] at some" intersections, "and if there was traffic [he] stopp[ed]." The speed limit on 78th Street is 25 miles per hour, and although Officer Kennedy exceeded the speed limit, he said the SUV was traveling "at a much faster rate" of speed than he was. Officer Kennedy did not know what his highest rate of speed was because he "never looked at [his] speedometer," but stated that he "was not going at a fast rate [of speed] on 78th Street."

¶ 8    Officer Kennedy lost sight of the SUV after it turned right onto State Street from 78th Street. Officer Kennedy also turned right onto State Street and deactivated his lights and siren because he was no longer traveling against the direction of traffic. Officer Kennedy stopped when he noticed the accident at 76th and State Streets. At its maximum distance, the SUV was about four blocks ahead of Officer Kennedy's squad car. A video recording from the BP gas station at the intersection where the accident occurred was played at trial and showed both the crash and Officer Kennedy arriving at the scene about 30 seconds later.

¶ 9    Although Officer Kennedy acknowledged that he was violating traffic laws as he drove westbound down 78th Street, he stated that he was "authorized" to do so under certain circumstances, including during the emergency operation of his vehicle or during a pursuit. Officer Kennedy testified that, as a police officer, he knows it is his "duty, obligation, and responsibility" to recognize that motor vehicle pursuits are serious and that engaging in a pursuit is "inherently dangerous" because it poses a risk of injury or death to the officer, to the person being pursued, and to the general public. CPD General Order 03-02 defines a "motor vehicle pursuit" as an "active attempt" by a police officer to apprehend a driver of a vehicle who, "having been given a visual and audible signal by the officer" in an attempt to pull the driver over, "fails or refuses to obey such direction" and "flees or attempts to elude the officer." Officer Kennedy acknowledged that he is responsible for recognizing when a pursuit is not appropriate and that, when determining whether to engage in a pursuit with another vehicle, officers are supposed to conduct a balancing test that weighs "the necessity to immediately apprehend the suspect" against the "inherent risk of pursuit" to the general public.

¶ 10    Officer Kennedy testified that he engaged in that balancing test on July 3, 2008, and that, "within a block or two" of his beginning to follow the SUV, he determined that "a pursuit would be prohibited." Officer Kennedy testified that he was therefore not "in pursuit" of the SUV because he "was not actively trying to apprehend the operator of that vehicle." Instead, he was monitoring the direction of the SUV as it was fleeing. Officer Kennedy testified that *had* he actively intended to pursue and apprehend the offenders, he "would have been increasing [his] speed, trying to get up behind that vehicle, [and] be a lot closer to that vehicle."

¶ 11                                    B. Testimony of Andrew J. Scott III

¶ 12    Andrew J. Scott III, testified for Sheri Freeman as an expert on police practice and procedures. Mr. Scott began working in law enforcement in 1977 and worked as a police officer at the North Miami Beach Police Department from 1982 until he retired as the assistant chief in 1998. He then served as the chief of police at the Boca Raton Police Department until 2006, when he began expert witness consulting. Mr. Scott testified that, in preparation for his testimony in this case, he reviewed a great deal of material, including an audio recording of a 9-1-1 call from the day of the accident. On the recording, a woman, Gernell Austin, stated that she was almost struck by a white SUV that was going approximately 80 miles per hour near

Vernon Avenue and 78th Street, about four or five blocks west of where the police first began following the SUV.

¶ 13    Mr. Scott testified further that motor vehicle pursuits are inherently dangerous because, when an officer engages a suspect in pursuit, the driver being pursued will not want to be caught, "[a]nd some individuals drive so recklessly, so carelessly, they wind up killing individuals—innocent individuals." Mr. Scott stated that termination of a pursuit requires a police officer to stop and turn off his lights and siren because "the odds are the individual being pursu[ed] is going to see that he's no longer being chased and will probably go back into the mode of traffic or get off the main highway or get off of a side street and drive in a relatively normal fashion."

¶ 14    Mr. Scott was of the opinion that on July 3, 2008, the officers were engaged in a motor vehicle pursuit as defined by CPD policy. It was also Mr. Scott's opinion that the actions of officers Kennedy and Passarelli were willful and wanton when they ignored traffic control signals and drove above the speed limit in a "predominantly *** residential area." In Mr. Scott's opinion, the officers' willful and wanton conduct was a contributing factor in the collision, and if the officers had not pursued the SUV or had disengaged from their pursuit of it, the collision at 76th and State Streets would not have occurred. Mr. Scott stated that, "[w]ithout a doubt, but for their actions, [Tommye] Freeman would probably be alive."

¶ 15    On cross-examination, Mr. Scott admitted that less than two minutes passed between when the SUV left the alley and when it crashed at 76th and State Streets. Mr. Scott agreed that the distance covered by the vehicles in the instant case was fairly short for a pursuit, because the "average pursuit is approximately two miles, if not a little bit more." In addition, he agreed that once a chase is terminated, the majority of fleeing drivers would begin to drive normally "within a matter of minutes."

¶ 16                                C. Other Trial Witnesses

¶ 17    Sheri Freeman and Shevaz Freeman, the daughter and adopted daughter of Tommye Freeman, testified about their relationship with their mother and the day they learned of her death.

¶ 18    Dr. Kimberly Nagy, the doctor who treated Tommye Freeman after the accident, testified about Tommye Freeman's injuries that were caused by the accident. Dr. Nagy also stated that Tommye Freeman died as a result of those injuries.

¶ 19    The City presented no witnesses.

¶ 20                            D. Jury Deliberations and Verdict

¶ 21    The jury began deliberating at 4:20 p.m. on June 23, 2015. At 5:42 p.m., the jury had not yet reached a verdict and the circuit court dismissed the jury until 9:30 a.m. the next day.

¶ 22    The following day, at approximately 1:38 p.m., the jury sent a note to the circuit court asking, in part, "What happens if we can't reach a unanimous decision?" The court's response read: "No further information in response to above request will be provided. Please continue to deliberate. Thank you, the Court."

¶ 23    At approximately 4:50 p.m., the circuit court received word that the jury had reached a verdict. The jury found in favor of Sheri Freeman and awarded her $2,118,000. The jury also answered two special interrogatories, stating that the jury found that Officer Kennedy did

"engage in a course of conduct which showed an utter indifference to or a conscious disregard for the safety of others" and that the City's conduct was a proximate cause of Tommye Freeman's injuries and death. The verdict and the two interrogatories were all signed by each of the 12 jurors.

Counsel for the City requested that the jury be polled. The first seven jurors polled answered affirmatively when asked "was this and is this now your verdict." The eighth juror polled, however, had the following exchange with the court:

> "THE COURT: Catherine M. McConaghy, was this and is this now your verdict?
>
> JUROR McCONAGHY: No, your Honor.
>
> THE COURT: This is not your verdict?
>
> JUROR McCONAGHY: It was—it wasn't in the beginning. We had to sign the paper at the end because we were told we wouldn't be let out of the room.
>
> THE COURT: Okay. Is it your voluntary verdict?
>
> JUROR McCONAGHY: Under duress."

The court polled the remaining four jurors, who responded to the court's question in the affirmative, then returned to Ms. McConaghy:

> "THE COURT: Yeah, your signature appears on Verdict Form A, Special Interrogatory No. 1 and Special Interrogatory 2.
>
> Is it—is this your—you've used the word, 'duress.'
>
> JUROR McCONAGHY: Right.
>
> THE COURT: Can you explain what you mean by duress?
>
> JUROR McCONAGHY: I mean, by the pressure in the room in there was—
>
> THE COURT: Well, let me ask you—
>
> JUROR McCONAGHY: —not good.
>
> THE COURT: —this.
>
> I don't want to know what the deliberations were because that's private.
>
> JUROR McCONAGHY: Okay.
>
> THE COURT: That's private. And the jurors can make a decision whether or not they want to share that information, but let me ask you this: Do you want this to be your verdict, the verdict that I read in court?
>
> JUROR McCONAGHY: I would rather it not be.
>
> THE COURT: Well, I'm asking you specifically, do you want this to be your verdict? The answer is what?
>
> JUROR McCONAGHY: No.
>
> THE COURT: Okay."

The circuit court then asked the jurors to return to the jury room while it spoke with the attorneys, indicating that it would then "relieve [the jury] of [its] jury duty." There was a period of time, the amount of which is not precisely clear from the record, after 4:50 p.m. and before 5:30 p.m., during which Ms. McConaghy was back with the other jurors in the jury room but they were not deliberating. After the jurors were sent to the jury room, counsel for the City asked for a mistrial based on Ms. McConaghy's responses to the jury poll, and Sheri Freeman's attorney objected. Although the court had initially indicated to both the jury and the parties that

it would dismiss the jury, after further discussion with the attorneys, the court stated that it saw "no harm" in asking the attorneys to return the following day with clean verdict forms and that it would "research the issue with regard to the statements made by the particular juror." The court then called the jurors in and advised them, at 5:30 p.m., that they would be sent home for the night and should return the next morning.

¶ 26 The following morning, the circuit court first addressed the parties and attorneys outside of the jury's presence. The jurors again were together in the jury room for some period of time but were not deliberating. In objecting to the jury's continuing deliberations, counsel for the City recounted the exchange between Ms. McConaghy and the court, then noted that Ms. McConaghy "wanted to speak to the judge further" after the jury had been sent home the night before. In response, the court stated, for the record, that it "obviously did not talk to that juror and the appropriate response was that it was indicated that the juror was to be told that it would be improper for the court to talk to her. So [it] did not communicate with her." Counsel for the City argued that it "would be appropriate at least to speak with her this morning in person to determine the Nature [*sic*] of any coercion, if there is such." Counsel for the City further argued that, based on the circumstances, it was evident the verdict had been coerced. After additional brief argument, the court informed the parties that it would allow the jurors to continue their deliberations. The court noted that nothing in the transcript suggested that Ms. McConaghy was concerned for her health, safety, or welfare. The court further stated, "She used the word duress. But I think as counsel would agree part of serving on a jury is stressful. You are asked to reach an important decision affecting the lives of several people ***. So by its nature it is going to be a stressful process." In reference to speaking to Ms. McConaghy, the court stated that it would not call her in to speak with the court and the attorneys that morning but that, over the objection of counsel for Sheri Freeman, it would inform the entire jury that, if any juror had a question or an issue, that juror should write a note to the court.

¶ 27 When the jury returned to the courtroom, the circuit court explained that jurors would receive clean copies of the verdict forms and the special interrogatories and that they were to continue deliberations. The court also stated, as it had advised counsel it would, that if a juror wanted to communicate with the court, he or she should write a note "as you guys have done on one or two occasions already in this trial," and the sheriff would give it to the court.

¶ 28 Approximately five to seven minutes after deliberations resumed, the jury again returned a verdict in favor of Sheri Freeman in the amount of $2,118,000. When polled, each member of the jury agreed that it was their verdict. The circuit court denied the City's motion for a mistrial and entered judgment on the verdict.

¶ 29 On August 4, 2015, the City filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, arguing in part that the jury verdict was coerced. The circuit court denied the motion on November 30, 2015.

¶ 30                                        JURISDICTION

¶ 31 The City timely filed its notice of appeal on December 23, 2015. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered by the circuit court in civil cases. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015).

ANALYSIS

On appeal, the City argues that (1) the circuit court erred in denying its motion for judgment notwithstanding the verdict because the evidence at trial did not support a finding of proximate cause and, alternatively and (2) it is entitled to a new trial because the jury verdict was coerced. We consider each argument in turn.

## A. Proximate Cause

The City first contends that it was entitled to judgment as a matter of law because the evidence showed that Officer Kennedy's conduct was not the proximate cause of the accident that resulted in Tommye Freeman's death.

A circuit court should enter a judgment notwithstanding the verdict (judgment *n.o.v.*) " 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand.' " *Harris v. Thompson*, 2012 IL 112525, ¶ 15 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). In other words, "[w]here the uncontroverted evidence, viewed in the light most favorable to the plaintiff, establishes a complete defense, a court is justified in granting the defendant's motion for a judgment *n.o.v.*" *Id.* It is well-settled that the circuit court "must resolve conflicts in the evidence in favor of the plaintiff, and if it finds any evidence which, if believed, could support a verdict for the plaintiff, it is error to direct a verdict for defendant." *Hicks v. Hendricks*, 33 Ill. App. 3d 486, 490 (1975) (citing *Zank v. Chicago, Rock Island & Peoria R.R. Co.*, 17 Ill. 2d 473, 477 (1959)). A court's ruling on a motion for a judgment *n.o.v.* is reviewed *de novo. Harris*, 2012 IL 112525, ¶ 15.

In an action for negligence, including one in which the defendant's alleged conduct was willful and wanton, a plaintiff must prove that "the defendant owed a duty to the plaintiff, that the defendant breached this duty, and that the breach was the proximate cause of the plaintiff's injuries." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004). Generally, the issue of proximate cause is a question of fact; however, "it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover." *Id.* at 257-58.

The City argues that it was entitled to judgment as a matter of law because Sheri Freeman failed to prove that the actions of Officer Kennedy, in following the SUV, proximately caused Tommye Freeman's death. The City expressly disavows making any challenge on appeal to Sheri Freeman's claim that Officer Kennedy engaged in a "pursuit" on 78th Street or to the jury's finding, in a special interrogatory, that Officer Kennedy's conduct was willful and wanton.

A proximate cause analysis involves two aspects, both of which a plaintiff must show in order to recover: cause-in-fact and legal cause. *Rivera v. Garcia*, 401 Ill. App. 3d 602, 610 (2010). Cause-in-fact exists "when there is reasonable certainty that a defendant's acts caused the injury or damage." (Internal quotation marks omitted.) *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004). In considering whether conduct is a cause-in-fact of plaintiff's injury, courts use either the "but for" test or the "substantial factor" test. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. "Under the 'but for' test, a defendant's conduct is not the cause of an event if the event would have occurred without it," whereas "[u]nder the 'substantial factor' test, the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." (Internal quotation marks omitted.) *Id.*

¶ 40        Legal cause, in contrast, "involves an assessment of foreseeability." *Id.* ¶ 24. "[A] negligent act is a legal proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct." *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 255 (2003).

¶ 41        The City claims that there was no cause-in-fact in this case because Mr. Jones "was driving recklessly from the beginning, when Officer Kennedy had done no more than signal for Jones to pull over." The City's contention is that the mere signal to the SUV to pull over was not negligent conduct and certainly was not willful and wanton conduct and, since this alone was the cause of the SUV hitting Tommye Freeman's vehicle, the City has no liability. The City relies on the acknowledgment of Mr. Scott, Sheri Freeman's expert, that it would be "a matter of minutes" for a fleeing suspect to resume normal driving after a police officer was no longer in pursuit.

¶ 42        At trial, Officer Kennedy testified that after the occupants of the SUV had been identified as the perpetrators of the burglary, he attempted to pull over the SUV by activating his lights and siren and making a U-turn to pull up behind the SUV, but that as he attempted to maneuver behind the SUV, Mr. Jones accelerated westbound on one-way eastbound 78th Street. If that had been the only conduct at issue, we might agree with the City that there was no willful and wanton conduct that could be causally linked to Tommye Freeman's death. However, that was not, in fact, the end of Officer Kennedy's conduct. Instead, Officer Kennedy proceeded to follow Mr. Jones the wrong way down one-way 78th Street.

¶ 43        Although Officer Kennedy denied that this was a "pursuit" as defined by the CPD General Orders, he acknowledged that he interpreted Mr. Jones' actions as fleeing and that he followed the fleeing SUV in his squad car. Officer Kennedy followed the SUV accelerating away from him and speeding the wrong way down a one-way street, despite his conclusion that the required balancing test prohibited pursuit in that situation. Although Officer Kennedy testified that he was not going at a "fast rate of speed" on 78th Street, he acknowledged that he exceeded the speed limit, drove the wrong way down a one-way street, and did not stop completely at the intersections. He also acknowledged that he drove with his vehicle's oscillating lights activated and used the siren intermittently. In addition, Mr. Scott testified that Officer Kennedy's actions were a "pursuit" and that, if the officers had not pursued the SUV or had disengaged from their pursuit of it, the collision at 76th and State Streets would not have occurred and that "[w]ithout a doubt, but for their actions, [Tommye] Freeman would probably be alive." The jury had a basis for its conclusion that Officer Kennedy's willful and wanton conduct was the cause of Tommye Freeman's death.

¶ 44        In *Suwanski*, the Second District observed:

> "A police pursuit is unique in the sense that it can occur only if two vehicles are involved, the car that is fleeing and the car that is chasing. It is essentially symbiotic; both vehicles are necessary to have a chase. Thus, from the standpoint of causation in fact, it is difficult, if not impossible, under the facts of this case, to separate the two in terms of causation. Of course, a jury may very well conclude that both drivers were the proximate cause of the harm." *Id.* at 255-56.

Similarly here, based on all of the evidence presented, a rational jury could have concluded that Officer Kennedy's conduct in following the SUV, using his lights and siren and going the wrong way down a one-way street in a residential area, caused the accident that resulted in Tommye Freeman's death.

¶ 45     The City argues that Mr. Scott's testimony "was clear that a fleeing suspect will not resume normal driving for 'a matter of minutes' " and that, therefore, even if Officer Kennedy had never followed the fleeing SUV the wrong way down the one-way street, Mr. Jones still would have crashed into Tommye Freeman's vehicle based solely on the fact that the police had signaled him to pull over only a few minutes before the crash. This argument rests on speculation that if Officer Kennedy had not followed the SUV, Mr. Jones still would have continued driving the wrong way down 78th Street for almost a mile, would have driven at the same rate of speed, would have turned right onto State Street, and would have ignored the red light at 76th and State Streets. That is a lot to assume. Moreover, the City overstates the testimony of Mr. Scott, who did not, in fact, affirmatively declare that a fleeing suspect who is no longer being followed by the police would continue to drive erratically for a set period of time. Rather, Mr. Scott agreed, in response to questioning by counsel for the City, that once a chase is terminated, the majority of fleeing drivers would begin to drive normally "within a matter of minutes." This testimony by Mr. Scott is certainly not inconsistent with the jury's finding that Officer Kennedy's conduct in following the SUV caused the accident. Viewed in the light most favorable to Sheri Freeman, the evidence presented at trial supports a finding of cause-in-fact.

¶ 46     As to legal cause, the evidence also supports the finding that Officer Kennedy could reasonably have foreseen that his conduct in following the SUV that was being driven recklessly by Mr. Jones would result in an accident. Officer Kennedy observed Mr. Jones driving the wrong way down a one-way street at speeds of up to 80 miles per hour in a 25-mile-per-hour speed limit zone, and saw Mr. Jones going through street intersections without stopping. Simply based on this information, Officer Kennedy reasonably could have foreseen that, if followed by a police vehicle, this person would continue to drive recklessly, speed, and drive through intersections without stopping or consideration of any traffic signals or signs.

¶ 47     The requisite foreseeability is also demonstrated by the evidence regarding the CPD's policy on the pursuit of fleeing vehicles. Officer Kennedy testified that CPD policy requires officers to conduct a balancing test before engaging in a motor vehicle pursuit, weighing the benefit of apprehending a suspect against the risk to the safety of the general public. Officer Kennedy further testified that he conducted the balancing test and determined "within a block or two" of where he first encountered the SUV that a pursuit would be prohibited under the circumstances. Officer Kennedy also stated that pursuits are "inherently dangerous" and that it is an officer's duty and obligation to "recognize and be cognizant of the fact that motor vehicle pursuits are serious" because they pose a risk of injury or death to the general public, in part because the fleeing vehicle could be violating traffic laws. This policy reflects the foreseeability of accidents like the one that occurred in this case.

¶ 48     This court has reasoned:

"The very existence of the CPD's policies on pursuit is inexorably linked to the foreseeable injuries and/or death of parties to a dangerous pursuit or to a similar fate that could be met by a bystander ***. *** Police pursuits are surely not subject to a cookbook breakdown of outcomes, but reckless abandonment of studied and published pursuit policies can hardly be claimed to be incapable of being linked to injuries and/or death at the conclusion of the chase." *Rivera*, 401 Ill. App. 3d at 611.

See also *Suwanski*, 342 Ill. App. 3d at 256 (finding legal causation because a jury could find that it was reasonably foreseeable that chasing a vehicle through residential and commercial suburban streets, knowing that the driver of that vehicle was running stop signs and red lights, "would result in injury to some third person"); *Sundin v. Hughes*, 107 Ill. App. 2d 195, 203 (1969) ("[a]n officer who finds it necessary to pursue a suspect in order to apprehend him could be chargeable with knowledge that it was probable that the suspect would act in a negligent or even illegal manner to accomplish his escape").

¶ 49    In a similar vein, the City also argues that Mr. Jones's reckless driving was an intervening cause that broke the chain of causation. However, "the intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was itself probable or foreseeable." *Sundin*, 107 Ill. App. 2d at 203. Even if Mr. Jones's reckless driving was not a foreseeable, natural, and probable result of Officer Kennedy's initial attempt to pull him over, it *was* foreseeable that, in response to Officer Kennedy continuing to follow Mr. Jones the wrong way down a one-way street with his oscillating lights activated and exceeding the speed limit, Mr. Jones would *continue* to drive in a reckless manner, including driving at an unsafe speed and disobeying traffic signs and signals at intersections. That Mr. Jones might be involved in a traffic accident when he was driving recklessly was a further natural and foreseeable result of the officer's conduct in continuing to follow the SUV. Therefore, Mr. Jones's reckless driving was not an intervening force that broke the causal link between Officer Kennedy's conduct and the accident.

¶ 50    The City relies on *Wade v. City of Chicago*, 364 Ill. App. 3d 773 (2006), *Morton v. City of Chicago*, 286 Ill. App. 3d 444 (1997), and *Nelson v. Thomas*, 282 Ill. App. 3d 818 (1996), in support of its argument on proximate cause. Although, similar to this case, each of these cases involved a police chase in which a fleeing vehicle struck a third party, none of these cases control our decision here.

¶ 51    In *Wade*, the plaintiff sought to overturn a jury verdict for the City. *Wade*, 364 Ill. App. 3d at 779. The court rejected the plaintiff's claims on appeal that certain evidence should have been admitted on the basis that, even with that evidence, the plaintiff would not have been able to show willful and wanton conduct or proximate cause. *Id.* at 785. The negligent or allegedly willful and wanton conduct by the police officer was that he followed the fleeing suspect through several red lights, albeit at a slow rate of speed and often slowing down. *Id.* at 776-77. The plaintiff was injured when the fleeing vehicle drove up onto the sidewalk at 35 miles per hour and struck him. *Id.* at 774, 777. At that point, the officer was stuck in traffic about 20 to 25 cars behind the fleeing vehicle. *Id.* at 777. On this basis, the appellate court concluded that the record "contain[ed] no evidence upon which the jury could conclude that any action by [the officer] was the proximate cause of plaintiff's injuries." *Id.* at 774, 783. The driver of the fleeing vehicle's act of driving up onto the sidewalk, resulting in injuries to a pedestrian, even if done to evade the officer following him with his lights and siren activated, was "independent" and so unusual as to be an unforeseeable result of the officer's actions. *Id.* at 784. In contrast here, it was foreseeable that Mr. Jones, who was driving through intersections while traveling the wrong way down a one-way street, would continue this conduct if followed by a police car and would potentially run through a red light and cause an accident.

¶ 52    In *Morton*, the plaintiff was rendered paraplegic when a driver who was attempting to elude the police ran a red light and hit a taxicab, which then hit her. *Morton*, 286 Ill. App. 3d at 446. The plaintiff's action against the City in that case "was premised largely upon [the

- 10 -

officer's] failure to activate his siren." *Id.* at 448. The jury found in favor of the plaintiff and awarded her $2 million in damages but answered "no" to the special interrogatory asking whether the police officers had been willful and wanton. *Id.* at 446. In response to the inconsistency, the trial judge entered a verdict in favor of the City. *Id.* The plaintiff appealed. *Id.* In affirming the circuit court's grant of judgment to the City, the appellate court found that there was no evidence of a causal connection between the allegedly improper conduct and the plaintiff's injuries. *Id.* at 455. As the court noted: "[t]he absence of a siren did not impact on [the pursued driver's] actions in driving through a red light and into oncoming traffic." *Id.* Here, however, the conduct alleged to be the proximate cause of the accident was Officer Kennedy willfully and wantonly continuing to follow a reckless driver in a residential area which, as discussed above, foreseeably resulted in the driver continuing to drive recklessly and causing an accident.

¶ 53    In *Nelson*, the officers were involved in a multi-car police chase of a driver who ran a red light, colliding with and killing the plaintiff's daughter and son-in-law. *Nelson*, 282 Ill. App. 3d at 819, 821-22. The trial court had granted summary judgment to the defendant villages and police officers. *Id.* at 819. The appellate court affirmed, agreeing with the trial court that "[o]nly [the pursued driver's] decisions and actions caused the collision with the [decedents'] car. The police officers' actions were, at most, a part of the 'occasion' surrounding [the pursued driver's] actions, as they were responding to [his] crimes of theft and speeding away from the police." *Id.* at 828. While we agree with the City that there are apparent similarities between *Nelson* and this case, we do not have the benefit of a full record in that case, nor do we find it persuasive authority for overturning the jury's conclusion in this case that the officers' willful and wanton conduct was the proximate cause of Tommye Freeman's death.

¶ 54    We are more persuaded by the appellate court's reasoning in *Suwanski*, a case that involved an extended high-speed police chase that resulted in a crash that killed both the pursued driver and a third party. *Suwanski*, 342 Ill. App. 3d at 249, 252. There, the appellate court reversed the trial judge's grant of summary judgment in favor of the defendant village and police officer, finding that questions of material fact existed as to the issues of both proximate cause and whether the officer acted willfully and wantonly. *Id.* at 249, 256-58. As we noted above, the *Suwanski* court stated that a police pursuit "can occur only if two vehicles are involved" and that it was therefore "difficult, if not impossible, under the facts of [that] case, to separate the two in terms of causation." *Id.* at 255-56. The court further found that it was reasonably foreseeable that chasing the fleeing driver "at high rates of speed through residential and commercial suburban streets, knowing [the driver] was running stop signs and red lights, would result in injury to some third person." *Id.* at 256. Although the specific facts of *Suwanski* were more extreme than those in this case—the police chase lasted over eight minutes and for approximately six-and-a-half miles and both vehicles reached speeds of 100 miles per hour (*id.* at 252)—we find the similarities to be significant. Here, as in *Suwanski*, there was a basis for finding that an officer's willful and wanton conduct in following a fleeing vehicle could not be separated from the fleeing driver's reckless driving as a cause of the accident and that the accident was a foreseeable result of the officer's conduct.

¶ 55    As a final matter, the City contends that public policy disfavors liability. Citing *Wade*, the City argues that it is illogical and against sound public policy to impose liability for an "honest miscalculation" and that affirming this verdict would "encourage criminals to flee from the police more dangerously, knowing that the more recklessly they drive, the less likely the

officer will continue to pursue them due to the risk of a potential civil liability." *Wade*, 364 Ill. App. 3d at 784.

¶ 56 We believe that the City's public policy concerns are addressed by section 2-202 of the Local Governmental and Governmental Employees Tort Immunity Act, which provides that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2012). Under that act, where a police officer did not act in a willful or wanton manner, there is no liability, even if those actions proximately caused an accident that resulted in injury or death to a third party. Here, the jury specifically found that Officer Kennedy's actions were willful and wanton, a finding that the City does not dispute on appeal.

¶ 57 Based on all of the above, we cannot conclude as a matter of law that, when viewed in the light most favorable to Sheri Freeman, the evidence presented at trial so overwhelmingly favored the City that "no contrary verdict based on the evidence could ever stand." (Internal quotation marks omitted.) *Harris*, 2012 IL 112525, ¶ 15. Accordingly, the circuit court properly denied the City's motion for a judgment *n.o.v.*

¶ 58                                   B. The Jury Verdict

¶ 59 As an alternative argument, the City contends that it is entitled to a new trial because the jury verdict was coerced. The City claims that the circuit court's questioning of Ms. McConaghy, the juror who dissented from the initial verdict, the court's direction to the jury to return to deliberations the following day, after having at first indicated to the jury that it would be dismissed from service, and the court's acceptance of the verdict the following morning, after only five to seven minutes of further deliberations, were improper.

¶ 60 As the City acknowledges, we review these actions by the circuit court for an abuse of discretion. *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 39; see also *People v. McCoy*, 405 Ill. App. 3d 269, 275 (2010) (whether a guilty verdict was coerced when the judge permitted the jury to continue deliberations after they were told they would be sequestered is reviewed for an abuse of discretion); *People v. Morales*, 281 Ill. App. 3d 695, 705 (1996) (length of jury deliberations are reviewed for an abuse of discretion); *Bianchi v. Mikhail*, 266 Ill. App. 3d 767, 777 (1994) (reviewing, for an abuse of discretion, whether the circuit court should have declared a mistrial). An abuse of discretion occurs where a circuit court's decision is "arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt its view." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2014 IL App (1st) 130962, ¶ 23, *aff'd*, 2015 IL 118372.

¶ 61 "Before a verdict is accepted and recorded, the parties to the action have an absolute right to poll the jury as to whether each individual juror agrees with the verdict." *Bianchi*, 266 Ill. App. 3d at 779. "The purpose of polling a jury is to determine whether any individual jurors have been coerced by the other members of the jury into returning a certain verdict." *Id.* "Thus, when conducting the poll, the trial judge must be careful not to hinder a jury's expression of dissent." (Internal quotation marks omitted.) *Id.* "In determining whether a verdict was coerced, we must consider the totality of the circumstances." *Morales*, 281 Ill. App. 3d at 705. During the jury poll, the court should question each juror individually to ascertain whether the juror agrees with the announced verdict, and "[j]urors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict." *People v. Kellogg*, 77 Ill. 2d 524, 528 (1979). When

questioning a juror about his or her "present intent during the poll," the circuit court "must be careful not to make the polling process another arena for deliberations." *Id.* at 529. If the circuit court finds "that any juror does dissent from the verdict submitted to the court, then the proper remedy is for the trial court, on its own motion if necessary, to either direct the jury to retire for further deliberations [citation], or to discharge it [citation]." *Id.* at 528-29.

¶ 62    As we have also recognized:

> "Coercion is a highly subjective concept that does not lend itself to precise definition or testing and, as a result, a reviewing court's decision often turns on the difficult task of ascertaining whether the challenged comments imposed such pressure on the minority jurors as to cause them to defer to the conclusions of the majority ***." *People v. Wilcox*, 407 Ill. App. 3d 151, 163 (2010).

¶ 63    We begin with the comments and questions the court posed in polling the jury, the first time the jury returned its verdict. "A trial court's comments to the jury are improper where, under the totality of the circumstances, the language used actually interfered with the jury's deliberations and coerced a guilty verdict." *Id.*

¶ 64    Here, after Ms. McConaghy expressed her dissent, the questions asked by the court show that it sought to clarify what, exactly, about the verdict she disagreed with and what she meant when she said that she gave her verdict under duress. "No court in this State has ever held it error to continue the poll after discovering a dissenting juror, nor is the questioning of the dissenter improper of itself." *People v. Chandler*, 88 Ill. App. 3d 644, 649 (1980).

¶ 65    It appears to us that what the circuit court did here was in keeping with what our supreme court suggested a court should do in *Kellogg*, 77 Ill. 2d 524, which the City relies on. In *Kellogg*, the trial judge failed to respond to a juror's inquiry as to whether she could change her vote during the poll and instead simply repeated the question "Was this then and is this now your verdict?" three times. *Id.* at 527. After the third time, the juror agreed it was her verdict. *Id.* In concluding the juror's response cast doubt on the unanimity of the verdict, our supreme court noted that "[w]hen [the juror's] ambiguous response as to her present assent to the verdict was given, the court should have focused on her feeling as to the verdict returned. This he did not do and we cannot ascertain from her answer whether or not she adhered to the verdict she had signed." *Id.* at 530.

¶ 66    In this case, in contrast to *Kellogg*, the circuit court did not simply repeat the same question, but instead engaged in an exchange with the juror, asking her "Can you explain what you mean by duress?" Then, at the end of the exchange, the court had Ms. McConaghy reaffirm that she did not want the verdict she signed to be hers. The court then understood that its choice was to discharge the jury or direct it to continue deliberations. *Kellogg*, 77 Ill. 2d at 528-29.

¶ 67    We also reject the City's argument that the sequence of events following the polling of the jury mandated a mistrial. As the City acknowledges, the circuit court has the discretion to direct the jury to continue deliberations after a juror expresses dissent from the verdict returned to the court. Although the court here did initially indicate that it would dismiss the jury, after sending the jury to the jury room and discussing the appropriate course of action with the attorneys, the court sent the jury home at 5:30 p.m., asking them to return the following day. As noted above, the jury was given a clean set of verdict forms the next morning, which made it clear to Ms. McConaghy and all of the other jurors that she was not bound by the verdict she had previously disavowed.

¶ 68      The City also argues that Ms. McConaghy was coerced because the jury returned a verdict within five to seven minutes after reconvening the next day. The circuit court was entitled to consider the fact that, although the jurors' final deliberation period was brief, they also had a night at home to consider the case. When this second verdict was returned, the jury was again polled and each member of the jury agreed that the verdict was theirs. The court's only choice at that point was to accept the verdict or declare a mistrial. On the record before us, we cannot say that it was an abuse of the circuit court's discretion to believe Ms. McConaghy when she said that the verdict was hers and to accept the verdict.

¶ 69      The City relies on *People v. Friedman*, 144 Ill. App. 3d 895 (1986), and *People v. Branch*, 123 Ill. App. 3d 245 (1984), to argue that the jury's brief, five-to-seven-minute final deliberation period necessarily means that Ms. McConaghy's verdict was coerced. Both of those cases are distinguishable.

¶ 70      In *Friedman*, the reviewing court reversed a guilty verdict for a number of reasons, one of which was that the jury had been deliberating for more than four hours when they asked about the meaning of an instruction and the circuit court clarified the instruction and then informed the jury that, if they could reach no consensus within 45 minutes, they would be sequestered. *Id.* at 903. The jury returned a verdict five minutes later. *Id.* As this court observed in *McCoy*, in *Friedman* "it was clear that the jury could not have given due consideration to the newly defined legal concept in five minutes and, therefore, its verdict must have been coerced by the sequestration announcement." *McCoy*, 405 Ill. App. 3d at 278 (citing *Friedman*, 144 Ill. App. 3d at 903). Here, in contrast, the jurors were not threatened with sequestration or anything else by the court. Instead, they were sent home for the night. Moreover, no newly defined legal concept was introduced. We cannot say that the circuit court was required to conclude, as the appellate court did in *Friedman*, that the quick verdict was tied to something threatening done by the court that had "impermissibly hastened" the jury's decision. *Friedman*, 144 Ill. App. 3d at 903.

¶ 71      In *People v. Branch*, 123 Ill. App. 3d 245 (1984), the jury had been deliberating for four-and-a-half hours when the judge received a note from the jury, indicating it was deadlocked, with one person who did not want to vote guilty because he or she did "not want anyone to go to jail." *Id.* at 250. The judge called the jury into the courtroom and stated that the holdout juror "evidently should not have received jury service." *Id.* The judge then informed the jury that that overnight accommodations would be arranged "[i]n about an hour" and that deliberations would not be cut short "because of the dilemma it seems to indicate or the impasse that ha[d] been caused." *Id.* The jury returned a guilty verdict 10 minutes later. *Id.* at 252. The appellate court held that "the court's comment singling out the one juror who had expressed unwillingness to vote guilty and declaring that the juror should not have received jury service was so prejudicial as to constitute reversible error." *Id.* at 250. In combination with the comment about sequestration and the brief deliberation period, the appellate court found the comments "more likely *** had the effect of intimidating the juror into changing his vote." *Id.* at 251. Again, in contrast to the court's actions in *Branch*, in the present case, the court itself did not say anything disparaging about the dissenting juror and took no coercive action. Accordingly, *Branch* does not require us to find that the brief deliberation period alone is sufficient evidence of a coerced verdict such that the circuit court's refusal to declare a mistrial was an abuse of discretion.

¶ 72    The remaining case on which the City relies is also distinguishable. In *Bianchi*, again, the issue surrounding the jury verdict was just one of several bases for reversal. There, after a verdict was received, the first juror polled by the trial judge "expressed some doubt" about the verdict, so the judge stopped the poll and sent the jury back to deliberate further. *Bianchi*, 266 Ill. App. 3d at 772. The jury returned with the same verdict a second time, and the judge started the poll with the juror who had expressed doubt the first time. *Id.* When that juror continued to express doubt, the judge again immediately discontinued the poll and sent the jury back for further deliberation. *Id.* The third time the verdict was returned, every juror agreed with the verdict. *Id.* at 773. The appellate court found that the judge's actions of immediately discontinuing the poll after questioning only the first juror "effectively isolated the juror and conceivably could have had a coercive effect." *Id.* at 781.

¶ 73    In the present case, the court conducted the entire jury poll before further questioning Ms. McConaghy, then discussed with the attorneys what the next course of action should be, and then sent the jury home to return for further deliberation the following day. The facts of *Bianchi* are dissimilar to the facts in the present case and that case does not persuade us that the circuit court abused its discretion in refusing to declare a mistrial based on the jury's verdict being a product of coercion.

¶ 74    The dissent notes that, after the jury was polled, rather than immediately discharging the jury or directing them to continue deliberations, the court directed the jury to remain in the jury room for a period of up to 30 minutes, during which the jurors sat, without deliberating, with the dissenting juror in a room alongside the persons she had just claimed created her state of duress. While we understand the dissent's concern about the discomfort for this juror, we believe that the delay reflects the time that the circuit court felt that it needed to take in order to make a difficult decision. As the dissent points out, *Kellogg* directs the circuit court to either declare a mistrial or direct the jurors to keep deliberating. 77 Ill. 2d at 528-29. Here, the circuit court discussed these two alternatives extensively with counsel for both parties, beginning directly after the jury poll on the evening of June 24, 2015, at which point the court decided that it, and the attorneys, should reflect overnight on what the proper solution might be and return the next morning. That next morning, after having heard further from counsel for both parties, the court determined that the best alternative was to direct the jury to keep deliberating. The time that the court kept the jury together but not deliberating was the time the court took to get input from the attorneys and to reflect on which was the better course of action. During this time, the court changed its mind from its first directive to the jury, right after the initial poll, that they were going to be discharged, to its ultimate determination that they should be directed to continue to deliberate. We do not view the court's use of this time to hear input from the attorneys to be in disregard of our supreme court's directive in *Kellogg* or an abuse of the circuit court's discretion.

¶ 75    Considering the totality of the circumstances, we find that none of the circuit court's conduct in questioning Ms. McConaghy, in taking time to hear from the attorneys, in directing the jury to continue deliberations, or in accepting the jury's ultimate verdict was an abuse of discretion. The court here asked clarifying questions of the dissenting juror, talked to counsel for both parties, sent the jurors home overnight, consulted again with counsel for both parties, and ultimately asked the jury to continue to deliberate the next morning with new verdict forms. Although the jury deliberated a very short time the next morning, it was polled and unanimously affirmed the verdict, which the circuit court accepted. There is nothing in this

sequence of events to sustain the City's claim that the circuit court abused its discretion.

¶ 76                                              CONCLUSION
¶ 77          For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 78          Affirmed.

¶ 79          PRESIDING JUSTICE CONNORS, concurring in part and dissenting in part.
¶ 80          I concur with the majority's proximate cause analysis, but respectfully dissent from its jury
verdict analysis.
¶ 81          "The purpose of polling a jury is to determine whether any individual jurors have been
coerced by the other members of the jury into returning a certain verdict." *Bianchi*, 266 Ill.
App. 3d at 779 (citing *Goshey v. Dunlap*, 16 Ill. App. 3d 29, 34 (1973)). "Thus, when
conducting the poll, the trial judge must be careful not to hinder a juror's expression of
dissent." (Internal quotation marks omitted.) *Id.* In *Kellogg*, our supreme court set forth the
purpose and manner of conducting jury polling. *Id.* Specifically, the *Kellogg* court stated:

           "When a jury is polled, each juror should be questioned individually as to whether
      the announced verdict is his own. The poll should be conducted so as to obtain an
      unequivocal expression from each juror. [Citation.] The very purpose of the formality
      of polling is to afford the juror, before the verdict is recorded, an opportunity for free
      expression unhampered by the fears or errors which may have attended the private
      proceedings of the jury room. [Citation.] In conducting the poll, each juror should be
      examined to make sure that he truly assents to the verdict. [Citation.]

           *** Jurors must be able to express disagreement during the poll or else the polling
      process would be a farce and the jurors would be bound by their signatures on the
      verdict. Before the final verdict is recorded, a juror has the right to inform the court that
      a mistake has been made, or to ask that the jury be permitted to reconsider its verdict, or
      to express disagreement with the verdict returned. If the trial judge determines that any
      juror does dissent from the verdict submitted to the court, then the proper remedy is for
      the trial court, on its own motion if necessary, to either direct the jury to retire for
      further deliberations [citation], or to discharge it [citation].
           ***

           In conducting the poll, the judge must keep in mind that the influence of the trial
      judge on the jury is necessarily and properly of great weight and that jurors are ever
      watchful of the words that fall from him. [Citation.] Thus the judge, in posing questions
      to a juror during the poll, must carefully avoid the possibility of influencing or coercing
      the juror." (Internal quotation marks omitted.) *Id.* at 779-80 (quoting *Kellogg*, 77 Ill. 2d
      at 527-29).

¶ 82          The majority concludes from the exchange between Juror McConaghy and the court during
polling on June 24, 2015 (*supra* ¶ 24), that the questions asked by the trial judge showed that it
merely sought to clarify what the juror disagreed with and what she meant when she said that
she was under duress. I disagree. When the juror in question disclosed that, "We had to sign the
paper at the end because we were told we wouldn't be let out of the room" and that the pressure
in the jury room was "not good," this singled her out in front of the other jurors and placed her

- 16 -

in a position of extraordinary stress. Juror McConaghy was unequivocal in her answer that she did not wish this to be her verdict and the court failed to discuss it further with her in an appropriate manner.

¶ 83 In *Kellogg*, the supreme court plainly tells us that a juror should be allowed a forum to express him- or herself "unhampered by the fears or the errors which may have attended the private proceedings of the jury room." *Kellogg*, 77 Ill. 2d at 528. Here, the court failed to follow this directive, and Juror McConaghy was denied this expression.

¶ 84 Further, our supreme court's decision in *Kellogg* made it abundantly clear that a trial court must either discharge the jury or direct it to engage in further deliberations if a juror dissents from the verdict. *Id.* at 528-29. Yet, in the present case, the court did neither. Instead of immediately sending the jurors back to deliberate, the court stated to the jurors that they were being relieved of their duty to serve and subsequently sent them back to the jury room. There was no instruction to continue deliberations, and I believe that a reasonable person would have been under the impression that their jury service was at an end. Meanwhile, outside the presence of the jury, the court and the attorneys engaged in discussion as to how the situation should be handled. During this time, the jurors sat (not deliberating) for up to 30 minutes, with the dissenting juror in a room alongside the persons she had just claimed created her state of duress.

¶ 85 During the recess, the defendant's attorney moved for a mistrial; plaintiff's counsel disagreed, but the court made no ruling on the record. The court then asked the attorneys if they wished to argue further before he allowed the jury to leave and told them their service was complete. The defendant's attorney stated again that a mistrial should be granted. Subsequently and suddenly, the court and plaintiff's counsel addressed the jury returning the next day to deliberate, with defense counsel stating that would be inappropriate. The court then decided to bring back the jury the next day. With attorneys for both parties and the judge in chambers, a clerk informed the judge that Juror McConaghy wished to speak to him. The court denied this request.

¶ 86 When the jurors returned to open court, they were advised to return the next day between 9:45 a.m. and 10 a.m., even though they had been told by the court that they would be discharged. Upon their return on the following day, the court advised the jurors that clean copies of the same verdict forms and the same special interrogatories would be tendered to them. The court further advised the jurors that they should continue to deliberate. Generally, the court also told them that anyone who wished to communicate with the court could write a note and give it to the sheriff. The jury again returned to the jury room, and in a matter of minutes (approximately five to seven), a unanimous verdict was reached.

¶ 87 After Juror McConaghy disavowed the first verdict, she was forced to sit in the jury room with her fellow jurors for 30 minutes without deliberating, she was then told to return the next day without any certainty as to what was occurring, she was thereafter placed with the same jurors to re-deliberate, and she was denied a forum through which to express herself to the court. As a result, a coercive environment surrounding this dissenting juror was created. The frustration of a juror who offered her dissent, was singled out by the court for questioning in front of her fellow jurors, and was forced to endure this unusual procedural experience without appropriate explanation of what was occurring led to Juror McConaghy's capitulation. The result of her signing the forms with such little, if any, deliberation invites an inference of coercion.

¶ 88　　　"The purpose of polling a jury is to determine whether any individual jurors have been coerced by other members of the jury into returning a certain verdict." *Bianchi*, 266 Ill. App. 3d at 779 (citing *Goshey v. Dunlap*, 16 Ill. App. 3d 29, 34 (1973)). The trial court here failed to conduct an inquiry that would have allowed the dissenting juror to be heard or to determine if she had been coerced. Further, the court disregarded the mandate of *Kellogg* to declare a mistrial or have the jury continue to deliberate. As a result, in consideration of the totality of the circumstances, I believe the trial court abused its discretion in this matter, and this cause should be remanded for a new trial.